## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

|  |  |
|---|---|
| In re: SPECTRUM PHARMACEUTICALS, INC., SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | Case No. 2:13-cv-00433-LDG (CWH)<br>Base File<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**LABATON SUCHAROW LLP**
Jonathan Gardner (admitted *pro hac vice*)
Mark S. Goldman (admitted *pro hac vice*)
Angelina Nguyen (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Lead Counsel for the Class*

**THE O'MARA LAW FIRM, P.C.**
William M. O'Mara (Nevada Bar No. 0837)
David C. O'Mara (Nevada Bar No. 8599)
311 E. Liberty St.
Reno, Nevada 89501
Telephone: (775) 323-1321
Facsimile: (775) 323-4082

*Local Counsel for the Class*

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................... 1

II.     JURISDICTION AND VENUE ...................................................................... 9

III.    PARTIES ....................................................................................................... 10

IV.     CONTROL PERSON ALLEGATIONS.......................................................... 11

V.      SUBSTANTIVE ALLEGATIONS ................................................................ 13

        A.      The Company and its Business ............................................................ 13

        B.      The Generic Leucovorin Shortage ...................................................... 14

                1.      No Significant Difference Between Leucovorin and Fusilev ................... 15

                2.      Spectrum Begins Marketing Fusilev for Colorectal Cancer and
                        Sales Rise ................................................................................... 18

        C.      Fusilev Sales Characteristics............................................................... 22

        D.      Defendants Closely Track Fusilev Sales.............................................. 24

                1.      Clinic Sales ................................................................................. 25

                2.      Hospital Sales.............................................................................. 27

                3.      Sales Commissions ...................................................................... 28

        E.      Fusilev Sales Decline in Early Fall 2012............................................. 30

                1.      The Leucovorin Shortage Eases.................................................. 30

                2.      Defendants Conceal the Fusilev Sales Decline and Falsely
                        Reassure the Market.................................................................... 31

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS ....................................................................................... 36

        A.      Class Period Revenue and Guidance ................................................... 36

        B.      August 8, 2012 2Q 2012 Earnings Call .............................................. 38

        C.      August 30, 2012 Southern California Investor Conference................... 44

        D.      September 7, 2012 BioCentury Investor Conference ........................... 48

E.     September 10, 2012 Rodman & Renshaw Global Investment Conference .......... 49

F.     September 20, 2012 UBS Global Life Sciences Conference ................................. 52

G.     September 27, 2012 PropThink Interview ........................................................... 54

H.     October 9, 2012 BIO Investor Forum ................................................................. 57

I.      November 7, 2012 3Q 2012 Earnings Call .......................................................... 59

J.     November 15, 2012 Credit Suisse Group AG Healthcare Conference ................. 64

K.     December 12, 2012 Oppenheimer Holdings Inc. Healthcare Conference ............ 65

L.     January 9, 2013 JP Morgan Global Healthcare Conference ................................. 67

M.     February 21, 2013 4Q 2012 Earnings Call .......................................................... 69

VII.     THE TRUTH IS REVEALED ........................................................................................ 74

VIII.     ADDITIONAL SCIENTER ALLEGATIONS ................................................................ 76

IX.      CLASS ACTION ALLEGATIONS ................................................................................ 82

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE
         AFFILIATED UTE DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE
         FRAUD ON THE MARKET DOCTRINE ..................................................................... 83

XI.      NO SAFE HARBOR ...................................................................................................... 85

XII.     LOSS CAUSATION/ECONOMIC LOSS ...................................................................... 86

COUNT I Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(b)
         Promulgated Thereunder Against All Defendants .............................................. 87

COUNT II Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(a) and (c)
         Promulgated Thereunder Against All Defendants .............................................. 90

COUNT III Violation Of Section 20(a) Of The Exchange Act Against the Individual
         Defendants ....................................................................................................... 92

JURY TRIAL DEMANDED ........................................................................................................ 93

ii

Lead Plaintiff Arkansas Teacher Retirement System ("Plaintiff" or "ATRS"), by its undersigned attorneys, hereby brings this Consolidated Amended Class Action Complaint ("Complaint") against Spectrum Pharmaceuticals, Inc. ("Spectrum" or the "Company"), Rajesh C. Shrotriya ("Shrotriya"), Brett L. Scott ("Scott") and Joseph Kenneth Keller ("Keller"). The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included interviews of former employees of Spectrum and other persons with knowledge of the matters alleged herein; these confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.)),[1] and review and analysis of publicly available information, including United States Securities and Exchange Commission ("SEC") filings by Spectrum, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and consultations with experts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Plaintiff alleges as follows:

## I.    NATURE OF THE ACTION

1.    This action is brought on behalf of a class of purchasers of Spectrum's securities between August 8, 2012 and March 12, 2013 inclusive (the purchasers being the "Class" and the time frame being the "Class Period"). Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. (the "Exchange Act").

---

[1]    All CWs will be described in the masculine to protect their identities. *See* Appendix 1 for a list of all CWs cited herein.

2.     Spectrum is a biotechnology company that develops and commercializes a pipeline of late-stage clinical and commercial products, with a focus on oncology and hematology.   During the Class Period, Spectrum marketed three oncology drugs in the U.S.: FUSILEV ("Fusilev"), FOLOTYN and ZEVALIN.  Of these, Fusilev was indisputably the driver of Spectrum's overall revenue, comprising 79% ($153.3 million in net sales) of the Company's total revenue in 2011, and over 75% ($204.3 million in net sales, up over 33% sequentially)  in 2012.

3.     Fusilev is an injectable drug that is used as part of chemotherapy treatment, and is currently approved for use by the FDA for the following "indications": (1) in combination with 5-fluorouracil (a chemotherapy drug) in the palliative treatment of patients with advanced metastatic colorectal cancer; (2) in the treatment of bone cancer, in which it acts as a "rescue" compound that alleviates the side effects of chemotherapy, permitting the patient to better tolerate chemotherapy regimens; and (3) to diminish the toxicity and counteract the effects when patients have problems processing or "eliminating" methotrexate, a widely used chemotherapy drug, or where there is inadvertent overdosage of agents like methotrexate.  Fusilev can be administered in private clinics and was marketed to both hospitals and private clinics during the Class Period.

4.     Fusilev is essentially the purified form of a cancer drug, generic leucovorin, that has been available as a low-cost generic drug for over 50 years.  Leucovorin is a 50-50 mixture of two "isomers" or molecules that are structural mirror images of each other.  Such a mixture is called a racemic mixture, or "racemate."  One of the isomers in racemic leucovorin, the "levo-isomer," known as levoleucovorin, is the pharmacologically active ingredient.   The other "dextro-isomer" is inactive.  Fusilev consists only of levoleucovorin, and is thus twice as potent

2

as generic leucovorin (which contains 50% of the inactive dextro-isomer) and dosed at half the amount.

5.     During the Class Period, Spectrum sold Fusilev mainly through pharmaceutical wholesalers, also known as distributors. In 2012, 85% of Spectrum's total gross sales were made to only four distributors: Oncology Supply; McKesson Specialty; ICS; and Cardinal Health. Spectrum's marketing efforts were directed at end-users such as clinics and hospitals, sometimes organized as Group Purchasing Organizations ("GPOs"), that then placed orders with the distributors.

6.     Initially approved by the FDA in 2008 for osteosarcoma, a rare bone cancer, Fusilev sales were catalyzed by the shortage – due to manufacturing issues – of generic leucovorin, which was widely used in colorectal cancer therapy, that occurred with varying intensity from late 2008 to late 2012. As Shrotriya recounted during the Class Period, the FDA, in an effort to meet demand for leucovorin, and recognizing that Fusilev consisted of the identical pharmacologically active isomer present in leucovorin, contacted Spectrum several times during the shortage and approved the then off-label use of Fusilev as a leucovorin substitute for patients with colorectal cancer. Realizing the opportunity presented by the much larger colorectal cancer patient population (as opposed to the much smaller patient population for rarer osteosarcoma), Spectrum submitted a supplemental application to the FDA for Fusilev to be approved for use in colorectal cancer therapy, and the FDA approved Fusilev for that use (or "indication") in April 2011. It was only after this supplemental approval that Spectrum could actively *market* Fusilev as a colorectal cancer therapy.

7.     Consequently, Fusilev sales rose rapidly. As the generic leucovorin shortage began to ease beginning in the summer of 2012, however, the short sale interest in Spectrum

3

stock grew as speculation increased that Fusilev sales would correspondingly decline once low-cost generic leucovorin became readily available. The speculation intensified when the FDA approved a new generic leucovorin manufacturer, Sagent Pharmaceuticals, Inc. ("Sagent"), in September 2012. In response, Defendants mounted a campaign-like swing through multiple investor health conferences in the fall of 2012, offering specific rebuttals they claimed were supported by physician surveys and – most importantly – purportedly strong sales numbers.

8.     Defendants repeatedly and misleadingly asserted that (1) despite the increasing availability of generic leucovorin starting in the summer of 2012, Fusilev sales and end-user demand had remained stable, and internal data supported that doctors continued to order Fusilev even knowing that generic leucovorin was available; (2) the number of accounts ordering Fusilev continued to *increase* during 2012 and re-order rates were also up; and (3) contrary to speculation that Spectrum was being forced to heavily discount Fusilev to keep physicians interested, Fusilev's average sales price was actually increasing.

9.     Defendants further buttressed their case against the short sellers by making the following misleading arguments at multiple investor conferences. *First*, Defendants distinguished generic leucovorin by stating that where leucovorin manufacturers had little incentive to invest in marketing a low-cost generic, Fusilev had a dedicated sales team of 40-60 people during the Class Period that were actively calling physicians and hospitals. Moreover, internal Spectrum surveys purportedly indicated that more than half of practicing colorectal oncologists had yet to be pitched on the benefits of Fusilev, representing an as yet untapped and significant market opportunity.

10.     *Second*, Defendants noted that private clinic physicians, who are not bound by a hospital's cost-cutting incentives, had financial incentives to use Fusilev because of its

permanent "J-code," or Medicare reimbursement code, which allowed physicians to make a profit on Fusilev compared with a much lower profit, or even a potential loss, on generic leucovorin. Physicians are reimbursed under Medicare Part B at average selling price ("ASP") plus 6% for Fusilev and generic leucovorin, but Fusilev sold at about $150 per vial during the Class Period, whereas leucovorin sold for $40 a vial. Accordingly, a markup of $9.00 for Fusilev versus $2.40 for leucovorin represented a significant difference to purchasing groups. During the Class Period, approximately 65-75% of Fusilev sales were to clinics.

11.     *Third*, Defendants claimed Fusilev sales were "sticky" in that once a physician switched to Fusilev from generic leucovorin, he tended to stay with Fusilev because it was easier for staff to keep dosing at an accustomed level rather than having to change dosing practices part-way through a course of chemotherapy, which might lead to dosing errors and possible malpractice claims.

12.     *Fourth*, Defendants repeatedly asserted to investors that Fusilev had a better "clinical profile" than generic leucovorin as one of the reasons why "increasing" numbers of accounts were ordering Fusilev in the fall of 2012. Defendants cited a 1997 study that purportedly demonstrated that patients suffered less toxicity and survived longer by approximately 1.5 months on Fusilev. In fact, the study not only dosed Fusilev at twice the strength of the generic, making side by side comparisons difficult, but it concluded prominently in the abstract that there was no significant difference between the two drugs. Moreover, the 1.5 month difference was for "time to [disease] progression," *i.e.*, time taken for the cancer to spread, and not survival time. Indeed, the study Defendants cited concluded that there was no meaningful difference in median survival time.

5

13.     *Fifth*, Shrotriya repeatedly referred to Fusilev's growth over at least eight successive quarters as evidence that Fusilev sales were in no danger of falling off a "cliff," and that speculation to the contrary was false.  In response to observations that Fusilev sales had previously fluctuated in proportion to the availability of generic leucovorin, Shrotriya asserted that those fluctuations were prior to the FDA's 2011 approval of Fusilev for colorectal cancer therapy and reflected the FDA's previous requests that Spectrum help alleviate the shortage, and that the landscape now was completely "different."  For example, on Spectrum's 3Q earnings call on November 7, 2012, Shrotriya stated: "So what you are talking about the sales went down when the generic came up, that was because the [FDA] – because we could not sell the drug at that time.  Since April 2011 it is a different story. *Our sales have never, ever gone down; they have gone only one way, going up*."[2]

14.     *Sixth*, Defendants stressed the reliable supply of Fusilev over the demonstrated uncertainty with generic leucovorin supply, with its history of manufacturing issues and recalls of tainted product, as another reason physicians would prefer to stay with Fusilev – particularly when chemotherapy regimens lasted from 4-6 months per course, and physicians did not want to be forced to interrupt a regimen due to a supply shortage, or have to change dosing mid-way when changing between leucovorin and Fusilev.

15.     At the same time Defendants were falsely reassuring investors that Fusilev sales would not plummet with the re-emergence of generic leucovorin, however, internal pharmaceutical sales data available to Defendants showed the opposite – that Fusilev sales were beginning to slide as early as 2Q-3Q 2012.  With respect to sales to clinics, one former employee confirmed that from data contained in sales reports known as "867" and "852" reports, which

---

[2] All emphases added unless otherwise stated.

Spectrum received from every distributor on a weekly basis, Defendants knew at all times what the Fusilev inventory levels were at each distributor. With respect to sales at hospitals, Defendants purchased weekly drug distribution data ("DDD") compiled by IMS Health, the industry's leading information, services and technology company. DDD data would have alerted Defendants to declining hospital end-user demand in real-time.

16. Shrotriya was, in addition, an obsessively controlling CEO, publicly stating more than once that he personally interviews every Spectrum employee, down to the janitorial staff. According to one former employee, Shrotriya's need for control extended to personally selecting the menu at the Company's Christmas party. Shrotriya unquestionably was aware that Fusilev sales were declining. At the same time he was repeatedly reassuring the market of the opposite at numerous investor conferences in the fall of 2012, he sold 735,993 shares of his Spectrum stock for net proceeds of *almost $7 million*.

17. The decline in Fusilev sales was also reflected in the fact that sales personnel stopped earning commissions in the fall of 2012. Commissions were paid based on sales above a set level. Salespeople pitched directly to end-users, who then separately placed orders through distributors, and thus could not track their sales numbers directly. Spectrum, however, would issue monthly reports detailing their commissions, if any. When commissions dried up in the fall of 2012, it was apparent to everyone at the Company that Fusilev orders were falling.

18. According to one former manager responsible for the largest sales accounts, Defendants knowingly hid the decline in Fusilev sales for as long as possible. Keller, who left Amgen Inc. ("Amgen") to join Spectrum in September 2012 as its new COO, was joined by other former managers from Amgen during the Class Period, including Joseph Turgeon ("Turgeon"), who joined Spectrum in October 2012 as Chief Commercial Officer. On

7

discovering the ongoing slide in Fusilev sales at the time they joined Spectrum, Keller and this "Amgen regime" were concerned that revealing the truth would make it seem that the legacy Amgen management team was responsible for missing earnings. Defendants concealed the decreasing demand by "stuffing" distributor channels and the Company's largest clinic accounts as long as they could, offering distributors and large clinics deep discounts for bulk purchases of Fusilev, particularly at quarter-end before Fusilev ASP was due to increase, even though end-user demand was plummeting.

19.     These discounted bulk purchases artificially shored up Fusilev sales numbers for the third and fourth quarters of 2012, disguising the decline in demand as generic leucovorin became more available, particularly after Sagent started producing leucovorin in October 2012. Yet by the 4Q 2012, the scheme was reaching its limits, with the bulk discounts beginning to affect other financials.    Analysts questioned why gross-to-net revenues had increased significantly in the 4Q even as Shrotriya continued to assert that the number of Fusilev accounts continued to increase. Defendants claimed the discrepancy was due to "government mandated" discounts on Fusilev sales to hospitals qualifying for the federal "340B" drug discount program, applicable only to certain eligible hospitals (*e.g.*, those with a large share of low income patients, sole community hospitals, and freestanding cancer hospitals). As 340B eligible hospitals cannot be part of a GPO (in contrast with most private oncology clinics, whose GPOs are largely owned by pharmaceutical distributors) and Defendants acknowledged during the Class Period that hospitals generally preferred to use low-cost generic leucovorin, Defendants' 340B "explanation" was likely a false assertion intended to hide the ongoing discounting and channel stuffing.

8

20.     Defendants' scheme fell apart when distributors and clinics reached capacity levels with their Fusilev inventories.  As end-user demand dried up, and because Defendants had overloaded distributor and clinic inventories with their bulk discounts, inventories backed up. The truth was finally revealed when Spectrum issued a press release after the market had closed on March 12, 2013, in which Defendants acknowledged that "[b]ased upon recent communications with customers, Spectrum Pharmaceuticals anticipates a change in ordering patterns of FUSILEV following the recent stabilization of the folate analog market."  The press release further gave drastically reduced revenue estimates contradicting Defendants' statement, barely six weeks previously during the 4Q earnings call, that Fusilev revenues would be *higher* in 2013 than in 2012.  In response, Spectrum's stock price plummeted *over 37%* in a single day on unusually heavy trading volume, with 22,555,500 shares traded compared with an average daily trading volume over the Class Period of 1,148,078 shares.

## II.     JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

24.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

9

## III.   **PARTIES**

25.   On March 20, 2014, the Court appointed ATRS to serve as Lead Plaintiff in this consolidated securities class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Pub. L. 104-67, 109 Stat. 737.

26.   Lead Plaintiff ATRS is an institutional investor that provides retirement, disability, and survivor benefits to the thousands of current and former employees of the Arkansas education community.  ATRS has more than $14.2 billion in net assets held in trust for pension benefits, and includes 343 participating employers and more than 120,000 members as of June 30, 2013.  As set forth in the certification annexed to ATRS's Motion for Appointment as Lead Plaintiff, incorporated by reference herein, it purchased Spectrum's securities on the open market during the Class Period and suffered damages as a result of the misconduct alleged herein.

27.   Defendant Spectrum is a Delaware corporation that was originally incorporated in Colorado as Americus Funding Corporation in December 1987, became NeoTherapeutics, Inc. in August 1996, was reincorporated in Delaware in June 1997, and was renamed Spectrum Pharmaceuticals, Inc. in December 2002.  The Company has principal executive offices at 11500 South Eastern Avenue, Suite 240, Henderson, Nevada 89052.  Spectrum is a biotechnology company with fully integrated commercial and drug development operations, with a primary focus in hematology and oncology.  In 2012, Fusilev net sales were $204.3 million, up over 33% from 2011 revenues, and comprised *over 76%* of the Company's total revenue that year. Spectrum's common stock, at all times relevant here, traded on the NASDAQ under the ticker symbol "SPPI."

28.   Defendant Shrotriya is and was at all relevant times the Company's Chairman of the Board, President, and Chief Executive Officer.  During the Class Period, Shrotriya sold

10

735,993 shares of his Spectrum stock for net proceeds of *almost $7 million*, in addition to Shrotriya's total compensation of over $10.1 million for 2012 and over $5.6 million for 2013. Shrotriya was a direct and substantial participant in the fraud.

29.     Defendant Scott was Spectrum's Acting Chief Financial Officer and Senior Vice President from October 12, 2010 to June 3, 2013, and was also Principal Financial and Accounting Officer from November 16, 2010 to June 3, 2013.[3]  Scott was a direct and substantial participant in the fraud.

30.     Defendant Keller was Spectrum's Executive Vice President and Chief Operating Officer from September 11, 2012 until his resignation on April 17, 2014.[4]  Keller was a direct and substantial participant in the fraud.

31.     Defendants Shrotriya, Scott and Keller are collectively referred to as the "Individual Defendants." The Individual Defendants, together with Spectrum, are collectively referred to as the "Defendants."

## IV.    CONTROL PERSON ALLEGATIONS

32.     The Individual Defendants, because of their positions of control and authority as senior executive officers (and as Director for Shrotriya), had access to the adverse, undisclosed information about Spectrum's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

---

[3] Scott became Senior Vice President of Finance on June 3, 2013, concurrently with the Company's appointment of Kurt A. Gustafson as Executive Vice President, Chief Financial Officer and Principal Accounting Officer.

[4] Keller is only being charged with those false and misleading statements made after September 11, 2012.

11

33.     Each of the above officers of Spectrum, by virtue of his high-level position with the Company, directly participated in the management of the Company, and was directly involved in the day-to-day operations of the Company at the highest levels.   The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.   Fusilev revenues comprised the overwhelming majority of Spectrum's total revenues during the Class Period, and wholesaler and end-user data were fundamental aspects of Spectrum's core Fusilev business that the Individual Defendants followed, tracked, and were aware of, or should have followed, tracked and been aware of, at all times.

34.     The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.   Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

35.     As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to

correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

36.    Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Spectrum's securities during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omission) regarding Fusilev sales prospects, including the impact of generic leucovorin on Fusilev sales. The scheme: (i) deceived the investing public regarding Spectrum's operations and business, and the true value of Spectrum's securities; and (ii) caused Plaintiff and other members of the Class to purchase Spectrum's securities at artificially inflated prices, which fell as the truth concerning Spectrum's Fusilev sales ultimately became known.

37.    In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Spectrum, were acting on behalf of the Company in the regular course of business.  Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    The Company and its Business

38.    Spectrum's business strategy is to license or acquire late stage or commercialized oncology and hematology drugs, rather than sink resources into full scale drug development. During the Class Period, Spectrum marketed three oncology drugs in the U.S.: FUSILEV ("Fusilev"), FOLOTYN (a folate analogue metabolic inhibitor designed to accumulate

13

preferentially in cancer cells and trigger cell death), and ZEVALIN (for the treatment of follicular non-Hodgkin's lymphoma using a radioisotope).

39.     Fusilev is an injectable drug that can be administered in private clinics as well as hospitals.     It is the pharmacologically active isomer (the levo-isomer, also known as levoleucovorin) of the racemic compound, calcium leucovorin, which is a synthetic analog of folic acid, or folate.  Leucovorin is a mixture of equal parts of the pharmacologically active levo-isomer and the inactive dextro-isomer, and has been available as a low-cost generic drug for over 50 years.  As Fusilev consists only of levoleucovorin, it is twice as potent as generic leucovorin (which has 50% of the inactive dextro-isomer), and is accordingly dosed at half the amount.

40.     Fusilev is Spectrum's first approved drug, with the FDA approving it in March 2008 for alleviation of adverse events arising from high dose methotrexate therapy in osteosarcoma (bone cancer) patients.   In conjunction, the approval also permitted usage in treating patients with defective methotrexate elimination, and patients with folate deficiency due to accidental over usage of folate antagonists.  The Company launched Fusilev for osteosarcoma – a rare cancer with a correspondingly small market – on August 15, 2008.

**B.     The Generic Leucovorin Shortage**

41.     Leucovorin, or synthetic folate (essentially, a modified B vitamin), is an important drug used in cancer therapy that enables patients to tolerate full chemotherapy regimens that generally last 4-6 months.  Folate plays an important role as a cofactor in the biosynthesis of nucleotides that make up DNA.   Given its critical functional role, cells are sensitive to fluctuations in folate levels and to any disruption to the synthesis pathway, such as that caused by one common cancer treatment, methotrexate therapy.  Methotrexate is an anti-folate agent, and is a commonly used chemotherapy drug for the treatment of multiple tumor types. Leucovorin reduces the toxicity of methotrexate in two ways – first, by competing with

14

methotrexate for entry into cells, and second, by converting into functional forms of folate. A second use of leucovorin takes advantage of its ability to enhance the antitumor effect of 5-fluorouracil ("5-FU" or "FU"), which is one of the components of the FOLFOX (5-FU, oxaliplatin, and leucovorin) or FOLFIRI (5-FU, irinotecan and leucovorin) regimen, both common chemotherapy regimens.

42.     The shortage of generic leucovorin first emerged in November 2008. Only two companies at that time manufactured leucovorin – Teva Pharmaceuticals ("Teva") and Bedford Laboratories ("Bedford"). The FDA announced in November 2008 that both companies were unable to make an adequate supply, and the shortage compelled the American Society of Clinical Oncology ("ASCO") to issue a "Clinical Alert" to its members. To address the shortage, ASCO recommended that physicians substitute levoleucovorin, *i.e.*, Fusilev, at half the dose of generic leucovorin. In addition, it prompted healthcare providers to use the same J-Code (J0641) for reimbursement purposes. In December 2008, the National Comprehensive Cancer Network ("NCCN," an alliance of the world's leading cancer centers) guidelines also incorporated Fusilev as an alternative to leucovorin.[5]

### 1.     No Significant Difference Between Leucovorin and Fusilev

43.     Fusilev is essentially purified leucovorin, and is thus more costly to produce. Yet Fusilev exhibits similar efficacy and tolerability to racemic leucovorin. For example, a 1997 article in the Journal of Clinical Oncology[6] reported the results of a randomized study comparing the two drugs when used in combination therapy with 5-fluorouracil ("5-FU" or "FU"), a chemotherapy drug:

---

[5] Because Fusilev was only approved for use in treating osteosarcoma at that time, however, Spectrum could not actively market or promote Fusilev for any other indication.

[6] *See* Ex. 1, Werner Scheithauer et al., Fluorouracil Plus Racemic Leucovorin Versus Fluorouracil Combined With the Pure l-Isomer of Leucovorin for the Treatment of Advanced Colorectal Cancer: A Randomized Phase III Study. J. Clin. Oncol. 1997; 15(3):908-14.

*There were no significant differences* between the FU/racemic LV [leucovorin] and the FU/l-LV [Fusilev] arm in the overall response rate (25% v 32%), duration of response (7.2 v 8.0 months), median time to progression or death (6.25 v 8.0 months), or median overall survival time (14.5 v 15.0 months).  Except for minor myeloid toxic effects associated with FU/l-LV [Fusilev], *there was also no significant difference* in terms of adverse reactions.

44.     The article further stated that:

*The median time to progression was 6.25 months* (95% confidence interval [CI], 5.0 to 8.0) in the FU/racemic LV [leucovorin] arm, *and 8.0 months* (95% CI, 7.0 to 9.0) in the FU/l-LV [Fusilev] arm, *which is of borderline significance* (P = .0505)....  *The median survival time ... was not significantly different* at 14.5 months (95% CI, 12.0 to 17.0) for patients who received FU/racemic LV [leucovorin] versus 15.0 months (95% CI, 12.5 to 18.5) for those who received FU/l-LV [Fusilev] (P = .28).

45.     In other words, patients were living no longer, statistically, on Fusilev than they were on leucovorin (14.5 months vs. 15 months, or 2 weeks difference).  The difference in time to "progression," or spread of the disease[7] (*not* death) was only of "borderline" significance at 6.25 months vs. 8 months.  The study defined survival time as the time "from the date of first treatment *until death* or until the patient was last examined alive," distinct from "time to progression," which the study defined "as the interval between the date of first treatment and the date PD [progressive disease, or progression] was first observed."  Moreover, the study used Fusilev at identical dosages to leucovorin, *i.e.*, patients in the Fusilev arm received *twice* the effective dose of the active ingredient in both drugs – yet, there remained no significant difference between the two drugs:

[B]ecause the costs of the pure -isomer are substantially higher than that of racemic LV [leucovorin] (approximately 2.2-fold in Austria), *we decided to compare identical rather than equipotent doses of the two LV preparations. In fact, we wished to determine*

---

[7] The study stated that "Patients were considered to have progressive disease (PD) if the measurable tumor lesions increased by greater than 25% according to initial staging or if new lesions appeared within the first 2 months of therapy."

16

> *if use of a double-the-effective dose of LV in combination with FU*
> *(I-LV arm) would result in any substantial/clinically relevant*
> *difference in therapeutic effectiveness or incidence of adverse*
> *reactions.*

46.     Given the similarities between Fusilev and leucovorin, it was not surprising that oncologists turned to Fusilev during the shortage. *The Leucovorin Shortage: A Tangled Web of Similar Isomers and Huge Cost Differences*[8] (published July 2013) described the choices faced by oncologists: "to not use leucovorin and to increase the planned 5-FU dose by 10%, to purchase leucovorin from 'gray market' scalpers at inflated prices, to self-ration leucovorin by administering lower-than-standard doses, to substitute an expensive oral variant of 5-FU (capecitabine), or to use levoleucovorin [Fusilev].  Many thought the choice of substituting levoleucovorin interfered the least with patient care."

47.     For private practices (*i.e.*, clinics), there was an added financial incentive to use Fusilev because "[i]n situations where Medicare allows a 6% markup in the sale of chemotherapy drugs in the oncology office, it makes more economic sense to earn $148.50 monthly on levoleucovorin [Fusilev] than $8.34 on leucovorin." *Id.*

48.     Spectrum's sales force also were aware that there was no significant clinical difference between Fusilev and leucovorin, and did not make it part of their pitch to physicians. CW1 was employed by Inventiv Health ("Inventiv"), a company Spectrum contracted to sell Fusilev, as a Spectrum Oncology Specialist from August 2011 through May 2013. CW1 stated that he was initially trained by Inventiv, and then by Spectrum, on how to "actually sell Fusilev." CW1 was responsible for certain medical facilities, mostly clinics and a few hospitals, in Massachusetts, Rhode Island, New Hampshire and Maine.  CW1 initially reported to Peter Da

---

[8] *Available at* http://www.valuebasedcancer.com/article/leucovorin-shortage-tangled-web-similar-isomers-and-huge-cost-differences.

Costa, a Regional Sales Manager at Spectrum. CW1 stated that there was no clinical marketing pitch he was aware of that stated that Fusilev was superior to generic leucovorin.

49.     CW2 was an Oncology Sales Specialist at Inventiv, selling Fusilev exclusively from the end of 2011 through April 2013. CW2, who reported to a Spectrum Regional Sales Manager in the St. Louis area, was responsible for the Chicago area, selling to private practice clinics and oncology clinics within hospitals. CW2 stated that he was told there were no clinical benefits to Fusilev in comparison to leucovorin.

50.     CW3 was a former Senior Manager, Investor Relations at Spectrum from 2007-March 2012, reporting most recently to Ashok Gore, SVP of Pharmaceutical Operations. CW3 met with the senior executives prior to earnings releases, investor conferences, data releases, *etc.*, and was responsible for scripting investor presentations and writing all press releases. CW3 obtained revenue and balance sheet data for the earnings releases directly from Scott, the acting CFO, and would co-ordinate with Scott regarding analyst questions. CW3 confirmed that "there is no clinical benefit" to Fusilev over leucovorin.

### 2.      Spectrum Begins Marketing Fusilev for Colorectal Cancer and Sales Rise

51.     In efforts to ease the shortage, the FDA approached Spectrum and requested that Spectrum meet some of the demand for leucovorin in colorectal cancer therapy with Fusilev. At this point in the shortage, Fusilev had not yet been approved by the FDA for use in colorectal cancer therapy, but only for treatment of the much rarer osteosarcoma, or bone cancer. Reflecting the small osteoscarcoma patient population, Spectrum had only one manufacturer approved to produce Fusilev. When the FDA requested Spectrum's aid, it granted temporary approval of the off-label usage for colorectal cancer.

18

52.     Shortriya had already realized the business opportunity inherent in the significantly larger colorectal cancer patient population (more than 140,000 diagnosed annually). Spectrum announced in an October 31, 2008 press release that it had filed a supplemental new drug application ("sNDA") with the FDA for Fusilev in combination with 5-FU containing regimens in advanced metastatic colorectal cancer.  In the same press release, Shrotriya stated that "*[n]inety percent of the more than 500 million milligrams of leucovorin used in the United States is for colorectal cancer.*"

53.     Spectrum announced in October 2009, however, that it had received a "complete response letter" from the FDA rejecting the sNDA and stating that the sNDA did not demonstrate that Fusilev was "non-inferior" to leucovorin in treating advanced metastatic colorectal cancer ("mCRC").  On November 29, 2010 Spectrum announced in a press release that the FDA had accepted a resubmission of the sNDA for mCRC.  Spectrum finally received FDA approval for Fusilev in treating mCRC in April 2011, and since then has had at least three manufacturers approved to produce Fusilev.

54.     Shrotriya recounted the history of Spectrum's pre-April 2011 Fusilev sales for mCRC on Spectrum's 3Q 2012 earnings call on November 7, 2012:

> **Raj Shrotriya - Spectrum Pharmaceuticals Inc - Chairman, CEO and President**
>
> So if you go back and look, FDA had given us a special permission to promote drug, sell drug for [CRC] before we got approval in 201[1].  Sales went down because we couldn't promote [Fusilev], we couldn't even send it to the doctors even if they ordered it, because we were not approved.  *FDA turned the tap on and off.*
>
> So actually FDA called us – one day FDA called me at 1:30 at night and said, Raj, we have shortage of generic Leucovorin can you sell FUSILEV and I said no, we are not approved for colorectal cancer.  He said, no, we appointed [*sic*] special permission to do that, so special permission was given from FDA to sell for a finite amount of time.  *In 2008 December we sold for*

19

*about two week[s], in 2009 we sold for about two months, in 2010 we sold for about six months.*

*In 2011 we sold in first quarter when we actually had to import FUSILEV from Europe. We went to Pfizer to get – FDA actually allowed us to import FUSILEV from Europe because our manufacturers couldn't keep up with demand.*

55.    Shrotriya's recount misleadingly distinguished between pre-April 2011 Fusilev

sales and post-approval sales, when Spectrum was permitted to actively market Fusilev for

mCRC. Shrotriya dismissed the historical inverse connection between Fusilev and leucovorin,

where Fusilev sales ebbed with increased availability of leucovorin, as "pre-marketing" and thus

irrelevant to the landscape where Fusilev was actively marketed:

**Difei Yang - WallachBeth Capital – Analyst**

…. Could you help us understand why this time around it might be difference [*sic*] from *previous times where when the generics comes back to market, essentially the FUSILEV revenue tanked*?

**Raj Shrotriya - Spectrum Pharmaceuticals Inc - Chairman, CEO and President**

*So, Difei, actually your observation is not quite correct, it really is really wrong. The only time the sales of FUSILEV went down that was before Spectrum got approval for colorectal cancer. That was before 2011….*

So what you are talking about the sales went down when the generic came up, that was because the FD – because we could not sell the drug at that time. *Since April 2011 it is a different story. Our sales have never, ever gone down; they have gone only one way, going up.*

56.    Contrary to Shrotriya's dismissal of the continuing inverse relationship between

Fusilev sales and leucovorin availability, however, Spectrum's own salesforce were instructed to

emphasize Fusilev's availability compared to the lack of generic leucovorin as the main reason

for physicians to buy Fusilev.

57.    CW1 stated that when marketing Fusilev, he was told to focus on the fact that there was an "ample" supply of Fusilev and that there were no worries about "chasing it down," *i.e.*, there were no issues obtaining Fusilev, unlike the occasional difficulties securing generic leucovorin.  According to CW1, Fusilev did "not have much of a clinical pitch" given its similarity to leucovorin, so sales personnel relied solely on Fusilev's availability as a selling point.

58.    CW2 also stated that he and other sales personnel were instructed to pitch Fusilev as "readily available" and used "synonymously" to leucovorin.

59.    CW4 was a Regional Sales Manager at Spectrum from August 2011 through July 2012, and reported to Jim Kaveney, Spectrum's former Director of Career Training and Development.  CW4  spent a few months working in the field and then transitioned to being in charge of training sales personnel on selling Fusilev.  CW4 confirmed that that the goal for the Inventiv personnel was to get the point across that Fusilev "is available."

60.    Despite this pitch focus, however, some of Spectrum's customers did not switch over completely to Fusilev from leucovorin.  According to CW1, many of his customers were predominantly using generic leucovorin and "supplementing" with Fusilev, further underscoring the continuing inverse relationship between Fusilev sales and leucovorin availability.

61.    The Company also tracked the leucovorin shortage.  CW5 was Director of Government Affairs and Managed Markets at Spectrum from December 2010 through December 2013.  Most recently, he reported to Glenn Ravelo (former VP of Business Solutions)[9] and before Ravelo, he reported to Rick Gonzalez (SVP of Global Commercial Operations).  CW5 was responsible for managing issues related to reimbursement as well as issues related to private

---

[9] According to a January 27, 2012 press release, Ravelo oversaw the "FUSILEV Specialty Sales Team" and was responsible for "Account Management, Managed Markets, Government Affairs, Logistics and Business Informatics."

21

insurance companies, Medicare and Medicaid. CW5 recalled that the FDA's regularly published leucovorin shortage updates were circulated to the executives at the Company, including Jim Shields (former Chief Commercial Officer), Ravelo, and others.

62.    Capitalizing on the leucovorin shortage, Fusilev became Spectrum's main revenue generator in 2011 and 2012, comprising *79%* ($153.3 million in net sales) of the Company's total revenue in 2011, and *over 75%* ($204.3 million in net sales, up over 33% sequentially) in 2012. At the August 30, 2012 Southern California Investor Conference, Shrotriya stated that "Fusilev has been a growth driver in the company for revenue." Analysts also recognized Fusilev's critical importance to the Company. For example, a November 26, 2012 Dawson James report stated that "Fusilev is Spectrum's lead product and a key catalyst for the stock price in the last year."

## C.    Fusilev Sales Characteristics

63.    During the Class Period, Spectrum sold Fusilev mainly through pharmaceutical wholesalers, also known as specialty distributors, of oncology products. In 2012, 85% of Spectrum's total gross sales were made to only four distributors: Oncology Supply; McKesson Specialty; ICS; and Cardinal Health.

64.    Spectrum's marketing efforts were directed at end-users such as clinics and hospitals, sometimes organized as GPOs, that then placed orders with the distributors. GPOs are defined by federal regulation and refer to "any entity established, maintained, and operated for the purchase of prescription drugs for distribution exclusively to its members with such membership consisting solely of hospitals and health care entities bound by written contract with the entity."

65.    Physician offices and outpatient clinics are the primary customers of specialty distributors. The sites are privately owned, community-based centers that have office space as a

direct cost to the physician, and are not affiliated with a hospital. The largest GPOs for physician practices now are owned by the largest specialty distributors. For example, ION is the largest community oncology GPO, with 4,500 oncologists in 3,200 practices. ION has a prime vendor distribution arrangement with Oncology Supply, and both organizations are part of AmerisourceBergen's Specialty Group.

66.     Hospitals, the other main end-users of oncology drugs, rely on wholesalers as a purchasing channel to avoid keeping large inventories of drugs on-site. Wholesalers administer contracts between manufacturers and hospital GPOs. Unlike oncology clinics, hospital GPOs are independent entities from distributors. A subset of hospitals are those that participate in the federal 340B drug discount program, which pharmaceutical manufacturers must participate in to receive Medicare coverage of their drugs. 340B hospitals are those that meet certain characteristics such as having a disproportionately large share of low-income patients, and cannot be part of a GPO.

67.     According to Keller on the February 21, 2013 4Q 2012 earnings call, at that time "approximately 75% of total FUSILEV business resides in the clinic segment," and "that number was in the 60%s, mid-60%s when we looked back six months." The Fusilev business was skewed toward clinics because hospitals put a priority on reducing costs. Spectrum salespeople confirmed that hospitals were eager to switch back to generic leucovorin, which cost a tenth as much as Fusilev over a course of treatment.

68.     CW6 was a Sales Specialist at Spectrum in Northern California from November 2011 through May 2013. During his tenure, CW6 sold Fusilev to hospitals and doctors' offices. CW6 stated that all of his accounts purchased through distributors. CW6 further stated that hospitals are the first to go with the generic over Fusilev, explaining that hospitals "don't care

about reimbursement," they just care about "up front" costs.   According to CW6, the hospitals would call the distributors on a daily basis to see if the generic was available.

69.   CW3 also stated that hospitals were problematic for Spectrum because they always go for the "LCA" or lowest cost alternative.   CW3 explained that it was known within Spectrum that the hospitals would stop buying the more expensive Fusilev once the leucovorin shortage eased.

70.   CW7 was the Director of National Sales at Spectrum from August 2011 through December 2013, generally reporting to the VP of Sales (a position with high turnover).   During CW7's tenure, he reported to Andy Amstrup (former VP of Sales), Ed Barnes (former VP of Sales), Glenn Ravelo (former VP of Business Solutions), Bobby Fraelin (former VP of Sales), and Tim Smith (current VP of Sales).   CW7 implemented the Company's marketing strategy at the time and was responsible for supervising the Inventiv sales team.   According to CW7, Spectrum had two types of Fusilev clients: "small time clinic based" and the big hospitals. CW7 stated that the clinics made up the majority of the Fusilev buying customers, particularly those that were organized as GPOs that could pool purchasing powers, whereas hospitals were generally standalone entities, with some exceptions.   CW7 confirmed that Fusilev purchases were far more "slanted towards" the mid-sized clinics.

**D.   Defendants Closely Track Fusilev Sales**

71.   Because Fusilev was Spectrum's main revenue driver, it is not surprising that Defendants focused on the Fusilev business and tracked sales – and the status of the leucovorin shortage – closely.   Indeed, CW5 recalled attending many meetings where Fusilev was the Company's main "focus."   According to CW5, these sales meetings were with select senior management and involved discussion of Company priorities and resources.

24

72.     CW2 stated that he and the other sales personnel were instructed to "notate" and "report" any issues they observed "out in the field" related to the decline in sales of Fusilev due to the re-emergence of generic leucovorin on the market.  According to CW2, they were instructed to report all relevant issues directly to the former Director of National Sales.

### 1.     Clinic Sales

73.     In its Forms 10-K filed with the SEC for the fiscal years ended December 31, 2012[10] and December 31, 2013,[11] Spectrum confirmed that it paid fees to distributors for data compiled by wholesalers on Fusilev inventory and end-users: "Distribution and data fees are paid to authorized wholesalers and specialty distributors of FUSILEV... as a percentage of WAC [wholesale acquisition cost] for products sold.  The services provided include contract administration, *inventory management*, *product sales reporting by customer*, returns for clinics and hospitals."

74.     These "fee for service" or FFS arrangements are common in the industry, and are enabled by data sharing between manufacturers and wholesalers.  Pharmaceutical wholesalers use two standard Electronic Data Interchange ("EDI") reporting formats: (1) EDI transaction set 852 (Product Activity Report, or "852 reports"), which reports information such as inventory levels and the volume of product sold; and (2) EDI transaction set 867 (Product Transfer and Resale Report, or "867 reports"), which reports information such as wholesaler sales to an end customer.  The amount and customization of data in each of these report types depend on the specific agreement and fee arrangement between the manufacturer and wholesaler, but generally 852 data constitute an accurate and timely measurement of inventory on hand at wholesalers, and 867 reports detail the specific locations to which product is shipped.

---

[10] Filed with the SEC on February 28, 2013.  An amended Form 10-K/A containing the same language cited in this paragraph was filed with the SEC on December 6, 2013.

[11] Filed with the SEC on March 12, 2014.

75.    CW7 confirmed that during the Class Period, the Company purchased data from wholesalers that detailed how much Fusilev the wholesalers were buying and which end-user medical facilities were buying Fusilev from a particular wholesaler.

76.    CW8 initially was an Associate Director of National Accounts at Spectrum from January 2009 through November 2011, transitioning to Regional Business Manager from September/October 2011 through November 2013. He reported to Glenn Ravelo (former VP of Business Solutions). As Associate Director of National Accounts, CW8 was responsible for the McKesson and US Oncology Fusilev accounts until late 2011. For the remainder of his tenure, CW8 worked on direct contract sales to the larger clinics. CW8 was very familiar with the different types of contracts offered to the distributors, the GPOs, and the large clinics. According to CW8, David Mareske (former Director, Regional Business Managers) received 852 and 867 reports from every distributor *on a weekly basis*. CW8 stated that Spectrum paid the distributors fees called "2:2:2," shorthand for "2% for dating, 2% data, and 2% for distribution." CW8 further stated that from these reports, Spectrum knew each distributor's inventory levels during the Class Period.

77.    CW4 also recalled that 867 reports were distributed weekly and detailed sales.

78.    CW9 was Associate Director of National Accounts at Spectrum from 2010 through March 2012, initially reporting to Rick Gonzalez (Deputy Chief Commercial Officer) and then Glenn Ravelo (former VP of Business Solutions). CW9 worked with the wholesalers and GPOs that were supplying Fusilev to the hospitals and the private oncology practices (*i.e.*, clinics). CW9 confirmed that Spectrum had visibility into clinic end-user data, and recalled specifically getting "direct data" from Oncology Supply and McKesson. CW9 stated that the Company had visibility for the clinics because they sold "bulk contracts," explaining that if the

26

clinic bought a certain amount, Spectrum would give it a certain discount if the order was made by the end of the quarter. According to CW9, the clinic end-user data was on an excel spreadsheet. CW9 recalled seeing clinic end-user data on a weekly, or at a minimum monthly, basis. CW9 recalled concerns about the re-emergence on the market of generic leucovorin throughout his tenure.

79.    CW10 was the Senior Level Network Administrator in Spectrum's IT department from July 2009 through September 2012. He most recently reported to Reneil Thompson (former Chief Technology Officer). CW10 was responsible for technical support for the executives, including Shrotriya. According to CW10, each department at Spectrum (commercial, sales, *etc.*) had an internal shared drive through a "VPN," or virtual private network. CW10 stated that the Company used an early version of "SAGE software" to track payables and receivables. CW10 further stated that the Company's 867 reports were in the form of excel spreadsheets and were stored in the commercial business unit's shared drive. CW10 confirmed that Shrotriya had access to all of the business units' shared drives on his personal computer.

### 2.    Hospital Sales

80.    Unlike Spectrum's main Fusilev clients, private clinic GPOs that were largely owned by distributors, the Company's hospital sales were generally to standalone entities, as CW7 confirmed. CW9, who left Spectrum in the spring of 2012, stated that at that time, Spectrum's visibility into end-user data was limited to the clinics as "they could track on the clinic side," but that the Company lacked visibility into the hospitals using Fusilev, probably because Shrotriya – notorious for "fiscal discipline" – chose not to purchase it at the time.[12]

---

[12] For example, in an interview with PropThink published on September 27, 2012, Shrotriya stated: "I was in Boston when we announced the acquisition of Allos on Friday at about 5 o'clock. *I made sure that between 5:00*

According to CW4, access to complete end-user data was not a given, Spectrum had "to choose" to purchase the data from the wholesalers. Where it might be less expensive to purchase end-user data for clinic GPOs because they were owned by the distributors, it likely was more costly to purchase end-user data for independent hospitals.

81.     By the fall of 2012, however, Spectrum had acquired visibility into hospital sales through the purchasing of drug distribution data ("DDD" data, sales data aggregated from hospitals by zip code) from IMS Health, the industry's leading information and services company. This followed the appointment of Keller on September 11, 2012 as COO, and of Keller's former Amgen colleague, Joseph Turgeon ("Turgeon"), as Senior VP of Sales and Commercial Operations in October 2012.  According to two separate postings on Cafepharma, the industry's leading insider web log or "blog," Keller began purchasing DDD data in October or November of 2012.

82.     A Cafepharma post on April 15, 2013 at 2:41 p.m. states in response to the Company's contrary public position: *"You did have weekly DDD data in November of last year so the excuse of no DDD doesn't fly boys."*

83.     A separate Cafepharma post on April 15, 2013 at 2:59 p.m. states that *"KK* [Ken Keller] *signed the IMS contract in October/November of 2012* for weekly Fusilev DDD."

84.     CW5 also recalled that in the Fall 2012, the senior level sales personnel were attempting to get "additional data."

### 3.     Sales Commissions

85.     Because Spectrum's sales force worked on commission, which they earned if Fusilev sales exceeded a certain set amount, the Company necessarily had to track Fusilev sales

---

*and 6:00 o'clock most of the people at Allos were terminated, because we want to make sure that we don't carry on any expense in our books that we can get rid of."*

to ascertain commissions. Further, Spectrum's sales personnel pitched end-users, who then placed orders with distributors, such that the sales force did not know the amount of the order placed until they received reports detailing their sales and commissions, if any. To calculate commissions, therefore, the Company had to obtain all Fusilev end-user sales and order information from the distributors, and thus had an accurate, real-time measure of end-user demand at all times.

86. CW1 confirmed that all his clients placed Fusilev orders with one of the distributors, describing the process as bizarre because his "customers" would never tell him (or his colleagues) exactly how much Fusilev they planned to purchase.

87. CW2 explained that the way commissions worked at Spectrum was that the sales personnel were expected to hit a "baseline," which was a certain number of units. The sales personnel would only receive commissions if they exceeded the expected baseline. Although CW2 (and other sales personnel) were responsible for recording the clients they met with on a daily basis, CW2 confirmed that he did not "enter" sales since his clients purchased through various GPOs (the largest clinic oncology GPOs were owned by distributors). CW2 received monthly data reports from Spectrum, in the form of an excel spreadsheet, that detailed his sales.

88. CW11 was a District Manager at Spectrum from March 2009 to July 2012, reporting to the former Director of National Sales. CW11 stated that the sales personnel at Spectrum were paid on the basis of "demand sales," *i.e.*, end-user demand, and not on sales to the distributors.

89. CW12 was an Inventive Oncology Sales Specialist, selling Fusilev for Spectrum from August 2011 through May 2013. He reported to the former Director of National Sales. CW12's clients were clinics and hospitals in Tennessee. CW12 explained that he would meet

29

with his clients to discuss and market Fusilev, and that after the meeting, the clients would

contact their distributors (such as Cardinal Health, McKesson, and AmerisourceBergen) to place

their Fusilev order. According to CW12, after the order was filled, the distributors would send

end-user reports to Spectrum, which Spectrum then used to calculate commissions for their

salespeople. CW12 would then receive a report detailing his sales and commissions.

### E.   Fusilev Sales Decline in Early Fall 2012

90.     As the generic leucovorin shortage began to ease in the early fall of 2012, Fusilev

sales began a corresponding decline that only intensified when, in September 2012, the FDA

approved an additional manufacturer, Sagent, to produce leucovorin.

### 1.   The Leucovorin Shortage Eases

91.     On August 6, 2012, a Roth Capital Partners analyst report noted that according to

recent prescription data, as well as feedback obtained by its analyst, generic leucovorin was

starting to "trend up ever so slightly" based on "availability" of the drug.

92.     On September 7, 2012, the FDA announced that it had approved Sagent's version

of leucovorin a day earlier.

93.     A September 7, 2012 RBC Capital Markets Report stated:

> *[The] [l]eucovorin shortage appears to have stabilized.* Sixty
> percent of doctors reported no difficulty in getting leucovorin
> (34% previously) and only 37% stated leucovorin is more difficult
> to get (53% previously). *Supply is generally available and
> sufficient for most patients (~80% vs. 84% previously).*

94.     On October 29, 2012 Sagent announced the launch of its leucovorin product.

95.     The easing of the leucovorin shortage was immediately apparent to Spectrum's

sales force. CW1 recalled that in the fall of 2012, "lecovorin began appearing" more often, and

that his accounts were telling him "no, I have no problem getting leucovorin."

96.     According to CW2, the decline in Fusilev sales was apparent in the 3rd and 4th quarters of 2012, starting "around July." CW2 stated that internally, the decline in sales was attributed to "generic… generic was introduced back to the market." CW2 recalled receiving a flood of emails from "all the top people" about the decline in sales and reintroduction of generic leucovorin to the market. From the emails, CW2 observed an apparent urgency amongst the senior level sales personnel at Spectrum beginning in the summer of 2012. CW2 personally felt the effect of the sales decline, stating that he did not make any sales commission for the 3rd and 4th quarters in 2012 despite that he was out in the field and "good at what I do."

97.     CW5 stated that when Sagent began supplying generic leucovorin, it had a "major impact" immediately on the market by introducing a "more predictable" supply of leucovorin.

98.     CW12 began to hear about sales of Fusilev going down around June/July 2012, and recalled hearing of a nationwide decline in Fusilev sales around the time that his former boss left Spectrum in the summer of 2012. CW12 "definitely" observed a decline in sales in the latter part of 2012 – he and his colleagues stopped receiving sales commissions.

### 2.     Defendants Conceal the Fusilev Sales Decline and Falsely Reassure the Market

99.     As Regional Business Manager working on direct contract sales to the larger clinics during the Class Period, CW8 was well aware that there was trouble with Fusilev sales. He explained that the Company knew quarter-to-quarter what was happening with Fusilev sales, and that the decline in Fusilev sales predated the hiring of the "Amgen regime" in the early fall of 2012 – a reference to Keller and Turgeon – first occurring under the supervision of Gonzalez (Deputy Chief Commercial Officer), Shields (Chief Commercial Officer from June 2010 to October 2012), and Ravelo (VP of Business Solutions until June 2013).

31

100.    CW8 stated that the Company had visibility into the sales needed every quarter to achieve sales guidance.  CW8 recalled Ravelo beginning to "warn" the executives at the Company that they were experiencing a decline in sales before Keller joined the Company. CW8 stated that Ravelo knew this because he had access to data that detailed the "clinic channels."  He continued that when the new "regime" (*i.e.*, Keller and Turgeon) joined the Company, they were told about the decline in Fusilev sales but did not want to miss earnings since they were new at the Company.  According to CW8, the Spectrum executives knew that there was no validity to their public comments regarding Class Period Fusilev sales given the actual inventory levels they were seeing from the distributors.  CW8 reiterated that "everything was known when we were doing it" in reference to the Defendants' misleading February 2013 earnings release.

101.    CW8 further explained that based on the weekly 852 and 867 reports that Mareske (Director, Regional Business Managers) received from every distributor, the Company knew each distributor's Fusilev inventory levels.  CW8 described how Spectrum, in some quarters, would flood the distributors with Fusilev and then "make deals with certain clinics to draw out" their Fusilev revenue.  CW8 referred to this practice as a "shell game" with the distributors; eventually, according to CW8, the large clinic accounts and the distributors were "full" and could not take on any more inventory.  CW8 stated that Spectrum and its executives were well aware of this "shell game" in Q2 2012 and going into Q3 2012.  CW8 further stated that the Company met Q4 2012 sales numbers by "stuffing the channel heavy" even with "inventory high" and "demand going down."  According to CW8, Defendants knew for months that "demand was falling," and that there was no way that any clinic needed as much inventory as Spectrum had already sold to their distributors in previous quarters.  Eventually, distributor

32

inventory had backed up from lack of demand to the point that distributors would not accept any further bulk Fusilev sales, and Defendants were forced to disclose at the end of the Class Period that Fusilev sales were "anticipated" to be drastically lower, when in fact end-user demand had been in significant decline for many months.

102.    That Defendants knew end-user demand was falling and that wholesalers would have difficulty unloading inventory is also indicated by the Company's unusually large chargeback allowance for 2012.  Spectrum's Form 10-K for the fiscal year ended December 2012 (filed with the SEC on February 28, 2013) states: "we also give credits for chargebacks to wholesale customers that have contracts with us for their sales to hospitals, group purchasing organizations, pharmacies or other retail customers.  A chargeback is the difference between the price the wholesale customer (in our case, the GPOs) pays (wholesale acquisition cost) and the price that the GPO's end-customer pays for a product (contracted customer)."  The chargeback allowance for 2012 was *$15.2 million* compared to only $950,000 in 2011 and $5 million in 2013.  The unusually large amount reflects that wholesalers likely were offering deep discounts of their own to end-users in an effort to unload excess inventory – discounts that Spectrum was obliged to credit the wholesaler.

103.    CW9 confirmed that Spectrum engaged in "special pricing" agreements with distributors such as McKesson and Oncology Supply.  CW9 stated that Gonzalez and Ravelo negotiated these contracts with the distributors.  According to CW9, the terms of these special pricing agreements were not public.  He described them as bulk pricing agreements that offered the distributors special discounted pricing if they bought large quantities of Fusilev at the end of the quarter.

33

104.     CW9 further stated that in addition to the special pricing agreements, Spectrum offered even deeper discounts (in the form of special pricing agreements) to certain medical facilities.  CW9 described Florida Cancer Center, which purchased Fusilev through Ion, as an example.   CW9 recalled that the regional business managers would approach distributors and those large end-user accounts such as Florida Cancer Center to offer them large discounts if they ordered in "bulk" by the end of the quarter.  According to CW9, the discounts were available only for that quarter, and CW9 referred to this as the "ASP [average sales price] game" because if the accounts bought at the end of the quarter, then their bulk purchases would not have an impact on ASP for the next quarter.

105.     Defendants' falsely inflated Class Period Fusilev sales numbers misled the market into believing Defendants' emphatic rebuttals against speculation that – given the increasing availability of generic leucovorin – Fusilev sales would soon plummet.

106.     In the fall of 2012, with short sellers increasing their bets against the Company, Shrotriya and Keller embarked on a campaign-like swing through several investor health conferences, outlining the reasons – based on the purportedly strong financial figures – why Fusilev sales were not going to fall off a "cliff."   Shrotriya had good reason to mislead the market – he sold 735,993 shares of his Spectrum stock for net proceeds of *almost $7 million* at artificially inflated prices.  CW3 also observed that Shrotriya was consistently battling the short seller theory – which was later disclosed to be true – that Fusilev sales would plummet with the re-emergence of leucovorin.

107.     In their public comments, Defendants repeatedly and falsely reassured the market by stating that (1) Fusilev sales remained strong in spite of the increasing availability of leucovorin, thus demonstrating the "stickiness" of Fusilev sales, particularly in private clinics;

34

(2) the Company had observed good customer re-order rates and loyalty in the same period; (3) doctors preferred Fusilev because of its "better" clinical profile and its profitable reimbursement code; (4) Fusilev accounts were purportedly *increasing*; (5) contrary to market speculation, the Company was not offering price discounts to increase sales, rather, ASP was also increasing; and (6) unlike generic manufacturers with low profit margins and little incentive to invest in marketing, Spectrum had a dedicated team of Fusilev sales personnel marketing the drug, with over 50% of the available physician market yet to be contacted.

108.    Analysts accepted these arguments, in large part because of Defendants' fraudulently inflated Fusilev sales numbers. For example, a September 7, 2012 RBC Capital Markets Report stated:

> Supply is generally available and sufficient for most patients (~80% vs. 84% previously). *This is positive because Fusilev sales have increased without the shortage getting much worse* (or Fusilev has filled in for the shortage).

109.    Similarly, an October 23, 2012 Roth analyst report stated:

> In our discussions with the company, *they are not seeing any change in sentiment from both their distributors and clients.* We believe this is important because the prescription data below is only one piece of the Fusilev puzzle and yields a high level of variability since the revenues quoted by services do not take... rebates and discounts into consideration.
>
> The latest prescription data trends are found in the table below. Positive trends continue, in our belief for Fusilev, *while the NRx [new prescriptions] count appears to have diverged from the TRx [total prescriptions] count just recently, which may or may not be attributable to the concomitant modest uptick in leucovorin. Currently we believe it remains just "noise" and continue to look at the overall trend of Fusilev growth.*

35

VI.   **DEFENDANTS' MATERIALLY
FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

A.   **Class Period Revenue and Guidance**

110.   Defendants' failure to disclose the declining end-user demand and sales for Fusilev, their misleading statements regarding physician preference for Fusilev and the purported strength of Fusilev sales as generic leucovorin became increasingly available, and their artificial inflation of Fusilev sales numbers through bulk discounting and channel stuffing, as detailed in ¶¶8-20, 90-107, rendered the Company's Class Period revenues and guidance false and misleading. Those misleading figures (in millions) are set forth in the table below:

| Period | Fusilev Guidance | Total Guidance | Fusilev Revenue | Total Revenue | Source |
|--------|------------------|----------------|-----------------|---------------|--------|
| 2Q12 | n/a | n/a | $56.6 | $68.7 | 8/8/12 10-Q (signed by Scott)<br><br>8/8/12 2Q12 earnings call (Scott)<br><br>8/8/12 8-K (signed by Scott) |
| 3Q12 | n/a | n/a | $52.0 | $69 | 11/9/12 10-Q (signed by Scott)<br><br>11/7/12 3Q12 earnings call (Scott)<br><br>11/7/12 8-K (total revenue only, signed by Scott) |
| 4Q12 | n/a | n/a | "In the fourth quarter of 2012, FUSILEV sales were $44.5 million" – Scott, | $70.1 | 2/28/13 10-K (total revenue only, signed by Shrotriya) |

| Period | Fusilev Guidance | Total Guidance | Fusilev Revenue | Total Revenue | Source |
|---|---|---|---|---|---|
| | | | 2/21/13 4Q12 earnings call | | 12/6/13 10K-A (signed by Shrotriya)<br><br>2/21/13 4Q12 earnings call (Scott)<br><br>2/21/13 8-K (total revenue only, signed by Scott) |
| FY 2012 | "we will be doing over $200 million revenue this year" – Shrotriya, 8/30/12 Southern California conference<br><br>"well over $200 million" – Shrotriya, 9/10/12 Rodman and Renshaw conference<br><br>"$200 million, $250 million is a very good base revenue from FUSILEV." – Shrotriya, 9/20/12 UBS conference<br><br>"...and this year I expect our revenue will be well over $200 million." – Shrotriya, 12/12/12 Oppenheimer conference | "This year we expect to reach nearly $300 million in revenue. " – Shrotriya, 8/30/12 Southern California conference<br><br>"And we expect the pro forma revenue this year could be over $300 million in 2012." – Shrotriya, 9/20/12 UBS conference<br><br>"And Dr. Raj mentioned that we expect revenues -- pro forma revenues to cross $300 million this year." Shiv Kapoor, 10/9/12 BIO conference<br><br>"...we expect to end this year with pro forma revenues of greater than $300 million." – Shrotriya, 11/7/12 3Q12 earnings call<br><br>"...this year we expect our pro forma revenue to be over $300 million." – Shrotriya, 12/12/12 Oppenheimer conference<br><br>"We have three FDA- | $204.3 | $267.7 | 2/28/13 10-K (signed by Shrotriya)<br><br>12/6/13 10K-A (signed by Shrotriya)<br><br>2/21/13 4Q12 earnings call (Scott)<br><br>2/21/13 8-K (signed by Scott) |

| Period | Fusilev Guidance | Total Guidance | Fusilev Revenue | Total Revenue | Source |
|--------|------------------|----------------|-----------------|---------------|--------|
| | | approved proprietary anticancer drugs on the market, bringing revenue; revenue that will be over $300 million this year." – Shrotriya, 1/9/13 JP Morgan conference | | | |

111.    The  2Q 2012 and 3Q 2012 Forms 10-Q and the February 28, 2013 Form 10-K included certifications signed by Shrotriya and Scott, required under the Sarbanes-Oxley Act of 2002 ("SOX"), representing that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

**B.    August 8, 2012 2Q 2012 Earnings Call**

112.    The August 8, 2012 earnings call contained the following false and misleading statements regarding Fusilev and the purported strength of the Fusilev business:

> **Rajesh Shrotriya - Spectrum Pharmaceuticals, Inc. - Chairman, CEO and President**
>
> FUSILEV was approved by the FDA in April 2011, for the treatment of advanced metastatic colorectal cancer, the third leading cause of cancer-related deaths in the United States.
>
> Since the approval of FUSILEV, *physicians continue to increasingly use FUSILEV because of its purity, clinical profile*, and supply reliability. Physicians are now increasingly aware of many benefits that FUSILEV offers. And Spectrum has proven to be a reliable supplier of the vital drug. *As a result, an increasing number of practices continue to adopt FUSILEV.* This quarter, we had over 1,500 accounts that ordered FUSILEV. This is significantly up from over 1,200 accounts in first quarter of this year, and over 500 accounts in fourth quarter 2011.

.... Aggressive commercial support for FUSILEV is being now *rewarded by customer loyalty and increased market penetration. We continue to have the high reorder rate.* We estimate that FUSILEV now has approximately [2]9% penetration in the folate analog market over the past four quarters, *which is up from approximately 21% at the end of last year. Based on current trends, we expect the penetration to increase going forward.*

Colorectal cancer treatment regimen usually lasts between four to six months. Typical physicians do not change drugs midstream as long as patients are not progressing [*i.e.,* no disease progression]. In other words, once a physician has started a patient on FUSILEV-containing regimen, they are confident that they will be able to complete therapy without concerns of product availability. *We are pleased to see the traction and growth that FUSILEV is achieving.*

\*\*\*

### Joe Pantginis - ROTH Capital Partners - Analyst

....Obviously you keep delivering on the numbers. You're growing the brand and it's very sustainable *and you have the ability to show that.* And yet at the same time, with investors' abilities or lack thereof to track the growth of FUSILEV, it also is the 800-pound gorilla in the room.... So my question is, what is the discrepancy that we're seeing here with regards to how FUSILEV is tracked? We have our own prescription data. We think the trends are very strong there, but what is the Street missing, how they could be so far off with regard to their types of numbers that they're looking at?

### Rajesh Shrotriya - Spectrum Pharmaceuticals, Inc. - Chairman, CEO and President

....I can only tell you that we can't comment on the blogs of various people and their source of information. We know that even IMS data sometimes does not reflect the true usage of the drug or the orders of the drug. *We are presenting you exactly what the data is. What our data is. In three months, what our net sales are.* And that's what matters. *We have been growing sales of FUSILEV quarter after quarter* and we're very pleased with the progress. *And we expect this growth to continue....* And frankly, we focus just on the sales that we generate. And we are very pleased with the progress we're making with the brand.... *We are seeing more traction. We are seeing more reorders.* We are seeing practices are

very happy with the drug, with the brand, so we are very pleased with it.

\*\*\*

....That the progress with FUSILEV, we are now averaging almost $0.25 billion a year in sales. *And sales are growing. There are new accounts that we are adding every quarter. And the accounts that are existing, they are reordering* and we have very, very happy with the progress we're making and *we think this is sustainable and we keep growing further, because we think we have only about 29% penetration* at this time.

\*\*\*

### Mike King - Rodman and Renshaw - Analyst

...[T]here's a common perception that once the generic leucovorin shortage is alleviated, that basically you guys are toast. And so what I'd like to hear from you is number one, what's your understanding about the recent developments in the leucovorin shortage? And number two, assuming that at some point in the future the generic leucovorin does make it back to the marketplace, how does Spectrum continue to gain further share against generic equivalent?

### Rajesh Shrotriya – Spectrum Pharmaceuticals, Inc. – Chairman, CEO and President

...Quarter after quarter, around our earnings release there are some blogs appear and misinformation appears. And that has absolutely no basis. That information appears with trying to manipulate our stock or some malicious intent. *In fact, numbers speak for themselves.* I think people have to understand that FUSILEV is not leucovorin generic, which is a mixture of 50% biologically inactive dextro form and 50% levo form. That drug has been around for 60 years.

.... So we believe, not only the fact that FUSILEV got approval in 2011 as compared to generic leucovorin approval of 1952, the fact that ZEVALIN [*sic*][13] has a unique [J] code should clearly tell people who are educated enough to understand the marketing and selling of oncology drugs, that *it is differentiated product and it has nothing to do with generic leucovorin.* That's number one.

---

[13] Shrotriya uses "Zevalin" in error, as the entire paragraph makes clear that he is referring to "Fusilev" throughout.

> Number two, generic companies come in and out of market. The shortage of generic leucovorin, why is it shortage generic leucovorin? There are many companies that make it. They will compete with each other. There are companies that will get approval, more companies will get generic approval. *In fact, as generic leucovorin supplies increase in the marketplace, so in other words, the shortage is abating, FUSILEV sales are continuing to grow. So the penetration and traction of FUSILEV is sustainable.* And I believe the generic companies will compete with themselves, not with FUSILEV.

113.    These statements regarding the strength of, and future prospects for, the Fusilev business were false and misleading because of Shrotriya's failure to disclose that Fusilev end-user demand was in fact declining, and that Defendants were artificially inflating sales figures with bulk discounting and channel stuffing. *See* ¶¶90-102. The statement that physicians increasingly used Fusilev in part because of its "clinical profile" is also misleading because physicians – and Spectrum's own sales force – did not view Fusilev as having any clinical advantages. *See* ¶43-46, 48-50, 57-58. Shrotriya's statements emphasizing the size of the mCRC patient population, that market penetration was "only" 29%, that accounts and re-orders were increasing, and that physicians tended to stick with Fusilev and were "loyal" to Fusilev because of reliable supply, were also misleading because they implied that the Fusilev business would continue to grow, when in fact Shrotriya knew that sales and demand were declining. Shrotriya's statements regarding Spectrum's "data" and pointing to growth over the last several quarters as evidence that Fusilev sales would continue to grow were misleading because he failed to disclose that Fusilev demand was declining. *See* ¶¶71-102.

114.    Shrotriya further falsely stated Fusilev sales were "sustainable" when he knew that demand was declining, and he misleadingly dismissed generic leucovorin's threat to – and impact on – Fusilev sales by stating that Fusilev was "different," when both physicians and Spectrum's sales force viewed the two drugs as essentially interchangeable, and by falsely

41

asserting that Fusilev sales continued to grow even as the leucovorin shortage abated. *See* ¶¶43-46, 48-50, 57-58. In fact, Fusilev sales declined almost as soon as leucovorin supplies began to stabilize in the late summer of 2012. *See* ¶¶90-98. Shrotriya also flatly denied market speculation that increasing supplies of generic leucovorin would impact Fusilev sales when he knew the opposite was true.[14] *See* ¶¶71-102.

115.    Analysts focused on Shrotriya's misleading figures as purported evidence that Fusilev sales were still strong even with the increased availability of leucovorin. An August 8, 2012 Rodman & Renshaw report stated:

> Spectrum continues to expect Fusilev to perform well in 2012. In 2Q12, *the company sold Fusilev to 1500 accounts as compared to 1200 and 500 accounts in 1Q12 and 4Q11, respectively.* Based on Spectrum's analysis, Fusilev has a penetration of 29% in the folate analog market, up from 21% at the end of 4Q11. *Management further indicated that the company is observing high reorder rate and customer loyalty.*

116.    An August 8, 2012 Roth Capital Partners analyst report stated:

> We believe that Spectrum is positioned to easily beat our 2012 Fusilev revenue estimate of $202 million as *the company keeps delivering on Fusilev revenue growth. Mentioning "increasing demand" for Fusilev, Spectrum notes that manufacturing capacity has been expanded to meet uninterrupted supply needs.* In spite of the underlying risk of the leucovorin shortage centered "bear case", we believe that Fusilev's growth will remain strong for at least several quarters. Our projections for sustained growth of Fusilev sales are based on: 1) Spectrum actively marketing Fusilev, whereas *generic leucovorin is not actively marketed,* 2) the *leucovorin shortage being "technically" over, with the generic available* 3) *intrinsic financial incentives for physicians to prescribe Fusilev* versus leucovorin.

117.    An August 9, 2012 Roth Capital Partners report stated:

> Spectrum's management disclosed on the 2Q12 earnings call that the *strong quarterly Fusilev sales are supported by a number of new accounts,* with total >1,500 accounts placing orders for

---

[14] Shrotriya sold 208,500 shares from August 14-August 16, 2012.

Fusilev in 2Q12 compared to >1,200 in 1Q12. Market penetration to date is estimated to be ~29%, up from ~21-22% in 1Q12, and anticipated to "increase going forward."

\*\*\*

We are impressed with Spectrum continuing to deliver quarter over quarter revenue growth, *driven by strong Fusilev sales.* Management noted that physicians that initially prescribe Fusilev are unlikely to change therapeutic agents midway through a course of therapy, which typically lasts 4-6 months. We believe that this observation bodes well with our projection of sustained Fusilev growth over the coming quarters and are raising our 2012 revenue estimate from $202 million to $225 million.

118.    Compounding the misleading "marketing" distinction between Fusilev and

leucovorin, Spectrum announced the launch of a "marketing campaign." An August 15, 2012

Rodman & Renshaw report stated:

> *Spectrum... announced the launch of a marketing, sales and educational campaign to increase the market penetration of Fusilev.* The campaign will focus on educating medical oncologists, nurses and pharmacists about the clinical benefit of Fusilev in colorectal cancer. SPPI also launched a dedicated website, www.fusilev.com, and plans to conduct an online campaign and live educational programs. In addition, the company announced that it will utilize existing sales force for Zevalin to promote Fusilev. Of note, the company expects these initiatives to have a minimal impact on operating expenses.
>
> Recap of Fusilev product revenues. *In 2Q12, the company sold Fusilev into 1500 accounts as compared to 1200 and 500 accounts in 1Q12 and 4Q11, respectively. Based on Spectrum's analysis, Fusilev has a penetration of 29% in the folate analog (leucovorin) market, up from 21% at the end of 4Q11. During the 2Q12 call, management further indicated that the company is observing high reorder rate and customer loyalty.*

119.    An August 15, 2012 Roth Capital Partners report stated:

> Spectrum announced a new marketing campaign for Fusilev as well as, importantly, bringing to bear additional salesforce capacity (the Zevalin group). We also see potential Fusilev upside when aspects of the Allos salesforce is "activated" once the acquisition closes.

43

\*\*\*

It is already known that leucovorin supplies will further increase late 2012/early 2013, but recall that 1) *only Fusilev is branded and actively marketed*, 2) *the shortage is "technically" over with the generic available* and 3) there are intrinsic financial incentives for physicians to prescribe Fusilev versus leucovorin as well as likely finding comfort in a stable supply of drug. A potential "bear case" to these new sales efforts is that the company is digging in its heels with the looming generic competition, but that is not our interpretation.

### C.    August 30, 2012 Southern California Investor Conference

120.    Shrotriya made the following false and misleading statements regarding Fusilev

and the purported strength of the Fusilev business at the August 30, 2012 Southern California

Investor Conference:

> At Spectrum, this is a growth company. *We have strong financials,* we have fiscal discipline like none other.... Last year we did about $193 million in sales. *This year we expect to reach nearly $300 million in revenue.*
>
> \*\*\*
>
> [W]e got an FDA approval for our proprietary drug called Fusilev in 2008.... In 2010 we did $71 million. In 2011 we did $193 million. *And this year we expect the sales to be in [the] $300 million range.* As you can see, in first quarter we did 60 million and second quarter we did $69 million. In spite of our growing revenue, there are some people who don't get our story. They keep talking about Spectrum is going to go downhill. *Spectrum is doing deep discounts to doctors. These are all bullshit stories, my friends!....* Do not listen to those stories, friends.
>
> \*\*\*
>
> I will talk briefly about Fusilev because *Fusilev has been a growth driver in the company for revenue.* As I said last year we did, last quarter, the second quarter we did about 56, 57 million dollars' worth of sales. There's already over $200 million annualized revenue.
>
> \*\*\*

There's one study that was published – largest study that was published in Journal of Clinical Oncology, which is the referee [*sic*] journal, which was a headward comparison between the generic Leucovorin and levo-Leucovorin, or Fusilev.

And you will see that there's a statistically significant difference at P value .03 that there were more toxicities, grade 3 and grade 4 toxicities with generic Leucovorin than with levo-Leucovorin. And you know what grade 2 and grade 3, grade 3 and grade 4 toxicity means on bone marrow.

*Some of these patients required that they had to be given growth factors like Epogen, Neupogen, and you can see that there were none in the group with Fusilev.* And even on the efficacy to sponsor its patients on colorectal cancer *patients who got generic Leucovorin, they lived 6.25 months but Fusilev and levo-Leucovorin lived 8 months.*

Let me talk about Fusilev growth strategy. The naysayers say – they have been saying for the last eight quarters that Fusilev sales are going to go away. *I've been proving them wrong for eight quarters, and I'm going to keep proving them wrong forever.* Here is what we have done, here is our strategy. *Sales are growing for the following reasons*: (1) It's a pure substance…. Why would you put somebody's, a patient's arm intravenously, patient is already sick, who is already compromised, knowingly that the drug has some impurity – 50% of drug that you put in is impure. Now that Fusilev is available you don't have to do that. Fusilev is 100% pure, active levo-form.

\*\*\*

*And you can see our sales have being going up,* for $30 million in 2011 second quarter, to $41 million in Q3 '11. $44, $51, and $57 million *quarter after quarter*…. So I just believe in performing. I don't believe in getting into debates based on theoretical interests of other people. *But you can see that sales have constantly kept going up, and we have not slashed prices of Fusilev. In fact the prices of Fusilev have been going up.* There is something called average sales price or ASP. ASP for Q3 is higher than it was in Q2 or Q1. *So let me repeat. Spectrum has not slashed prices of Fusilev to woo any doctors. We have not.* In fact, we have increased prices in Q1, slight increase in prices, we have increased slightly in Q2, and for Q3 the average sale price is higher.

\*\*\*

45

> *We have more and more accounts ordering Fusilev.* Last quarter of 2011, Q4, there were like 500 accounts ordering [Fusilev]. In Q1 there were 1200 accounts that were ordering Fusilev, and in last quarter, Q2, there were like 1500 accounts that were offering Fusilev. *And each account, they repeat order for Fusilev – from the accounts that have ordered before. So there are new accounts, loyalty is very high from the people who have ordered once.*
>
> \*\*\*
>
> Currently we have penetrated about 29% of the market, with about *$220-$230 million in revenue we are only at about 29% of penetration of the market. So we have a huge upside still remaining for Fusilev.* And I want to repeat before I turn off this slide that our pricing strategy is very consistent. Ever since we've launched this drug last year, *we have not reduced the prices.* In fact, the prices of this drug have been increased. And the ASP of this drug for Q3 is higher than it was in Q2.

121.   These statements regarding the strength of, and future prospects for, the Fusilev business were false and misleading because of Shrotriya's failure to disclose that Fusilev end-user demand was declining, and that Defendants were artificially inflating sales figures with bulk discounting and channel stuffing. *See* ¶¶90-102. Shrotriya falsely stated that Spectrum was not offering "deep discounts" when in fact it was offering bulk discounts to its distributors and stuffing their channels with inventory. *See* ¶¶101-102. Shrotriya's statements that accounts were increasing and customer loyalty was high, and his pointing to the growth of Fusilev sales "quarter after quarter," were also misleading because they implied that the Fusilev business continued to grow, when in fact sales and demand were declining. *See* ¶¶71-102. Shrotriya's statement that the Company expected "$300 million" in Fusilev sales in 2012 was also misleading because he did not disclose that Defendants knew Fusilev demand was plummeting with the re-emergence of generic leucovorin in the late summer of 2012. *Id.*

46

122.    Shrotriya also misleadingly described the findings of the study in the Journal of

Clinical Oncology.[15]  Not only did that study find no significant difference in median survival

times (contrary to Shrotriya's statement that patients on Fusilev lived longer), the study's main

conclusion was that there was no significant difference between Fusilev and leucovorin, even

with patients being given twice the dose of the active ingredient in the Fusilev arm.  Moreover,

the study did not state that patients in the leucovorin arm had to be given "growth factors" as a

result of increased toxicity.  See ¶¶43-45.[16]

123.    Analysts were quick to note Shrotriya's emphatic (but false) statement that

Spectrum was not offering Fusilev at reduced prices.  An August 30, 2012 Roth Capital Partners

report stated:

> In a business update presentation today *SPPI's management
> reiterated that the price of Fusilev was not cut, and that the
> average selling price (ASP) actually increased from Q2 to Q3.
> Given the sustained growth of demand with an increasing number
> of accounts prescribing Fusilev, we continue to believe that the
> drug is poised for QoQ growth....*
>
> *Management reaffirmed that Fusilev pricing has not been
> discounted in an effort to increase the number of prescribers.*  In
> fact, the ASP increased progressively from Q1 to Q2 and Q3.  As
> previously disclosed, *the number of accounts prescribing Fusilev
> continued to grow QoQ,* with >1,500 accounts placing orders for
> Fusilev in 2Q12 compared to >1,200 in 1Q12 and an estimated
> ~29% market share.  *The increased demand is also punctuated by
> customer loyalty with repeat orders.*  Physicians typically have a
> patient commence the full ~4-6 month treatment course with
> Fusilev, as product supplies are guaranteed.  Fusilev is actively
> marketed by a dedicated salesforce of ~40 reps, and physicians get
> reimbursement assistance.

---

[15] *See* Ex. 2.  The slide accompanying Shrotriya's statements cites Werner Scheithauer et al., Fluorouracil Plus Racemic Leucovorin Versus Fluorouracil Combined With the Pure l-Isomer of Leucovorin for the Treatment of Advanced Colorectal Cancer: A Randomized Phase III Study. J. Clin. Oncol. 1997; 15(3):908-14.  That study concluded that there is no significant difference between Fusilev and leucovorin. *See* ¶¶43-45.

[16] Shrotriya sold 67,000 shares at artificially inflated prices from September 5-September 6, 2012.

**D.**     **September 7, 2012 BioCentury Investor Conference**

124.     Shrotriya made the following false and misleading statements regarding Fusilev and the purported strength of the Fusilev business at the September 7, 2012 BioCentury Investor Conference:

> This frequently diagnosed cancer, the third most frequently cancer in the United States, colorectal cancer, and it is the second largest cause of death. And this data shows that in a head-to-head study published in JCO [Journal of Clinical Oncology] compared it to [generic leucovorin], which is a mixture of Dextroleucovorin and Leucovorin to Fusilev which is Levoleucovorin, we found that there was a statistically significant difference in the Grade 3 and Grade 4 toxicities.
>
> There is more bone marrow suppression *in some of these patients on generic Leucovorin even needed growth factors like Neupogen and Epogen.* And if we look at the median time to progression to death in the Leucovorin, Levoleucovorin group *the Fusilev group in fact patients were living longer, eight months as compared to patients living six months to five months on the generic Leucovorin.*
>
> *Fusilev sales have been growing quarter after quarter.* You see we did $34 million and now we are doing quarter after quarter we are doing like $60 million, $50 million-- last time we did $56.5 million in last quarter....
>
> \*\*\*
>
> And with this sound pricing strategy – *in fact we have been taking both price increases between 2% and 6% quarter after quarter. And our average sales price has also been rising.* It has virtually $160 and $180, and now in fact we are expecting the ASP – the third quarter of the ASP, average sales price, is higher than it was in Q2 or in Q1. So we have a very strong, aggressive marketing strategy and pricing strategy for Fusilev in the marketplace.

125.     These statements regarding the strength of, and future prospects for, the Fusilev business were false and misleading because of Shrotriya's failure to disclose that Fusilev end-user demand was declining, and that Defendants were artificially inflating sales figures with bulk discounting and channel stuffing. *See* ¶¶90-102. Shrotriya misleadingly stated that Spectrum

was increasing prices when in fact it was offering bulk discounts to its distributors and stuffing their channels with inventory. *See* ¶¶101-102. Shrotriya's emphasis on the size of the patient population for mCRC and his pointing to the growth of Fusilev sales "quarter after quarter" were also misleading because they implied that the Fusilev business continued to grow, when in fact sales and demand were declining. *See* ¶¶71-102.

126.    Shrotriya further misleadingly described the findings of the study in the Journal of Clinical Oncology. Not only did that study find no significant difference in median survival times (contrary to Shrotriya's statement that patients on Fusilev lived longer), the study's main conclusion was that there was no significant difference between Fusilev and leucovorin, even with patients being given twice the dose of the active ingredient in the Fusilev arm. Nor did the study report, contrary to Shrotriya's assertion, that "some of these patients on generic Leucovorin even needed growth factors like Neupogen and Epogen" to counter bone marrow suppression. *See* ¶¶43-45.

**E.    September 10, 2012 Rodman & Renshaw Global Investment Conference**

127.    Shrotriya made the following false and misleading statements regarding Fusilev and the purported strength of the Fusilev business at the September 10, 2012 Rodman & Renshaw Global Investment Conference:

> *We have a very aggressive buyback program we announced, and this year alone, this last month alone, we bought about – more than 1 million shares.* We have 60 million shares outstanding. *We picked up over 1 million shares because we believe there's nothing better than to invest in yourself.* And if you believe your stock is undervalued, buy it. And that's what we did. We spent about $11.9 million of our cash that we made profit in buying our own shares.
>
> \*\*\*
>
> Colorectal cancer is the second leading cause of cancer death in men and women in the United States. More than 50,000 people will die this year. And it is the third most frequently diagnosed

49

cancer in men and women. About 153,000 people will be diagnosed with colorectal cancer this year.

This is a study that was published in Journal of Clinical Oncology, head-to-head comparison of FUSILEV with generic leucovorin, which is a mixture of dextro, which is biologically inactive form – it's like an impurity in this drug. And you find that *in terms of efficacy, patients on FUSILEV are living longer, 8 months versus 6.25 months on generic leucovorin.* And on side effect profile, if you see that with generic leucovorin, there were statistically significantly higher grade 3 and grade 4 toxicities on bone marrow suppression, and *some of these patients required bone marrow trans – bone -- transfusion, blood transfusion and the transfusion of growth factors.*

The sales of FUSILEV since it has been approved have been going up, as you can see, from about $33 million a year. We are doing about over $200 million a year now. If you analyze the last sales of $56 million, we are doing good – over $220 million in revenue.

The question is, how do we plan to maintain our sales? In fact, the naysayers have been saying from the day drug was approved, oh, nobody is going to buy this drug because it's generic leucovorin. *People have been saying, oh, once generic leucovorin becomes available, nobody is going to buy FUSILEV. We have proven them wrong quarter after quarter for the last eight quarters, and we are going to keep proving them wrong quarter after quarter.* Currently, we own about 29%-30% penetration. But what I said the last earnings call was that our accounts*, number of accounts that are ordering FUSILEV has been growing and the number of – and repeat orders have been growing.* So we have now reached a penetration of about 29%-30%.

How do we do it? We have a strong infrastructure. *Guess how many salespeople promote a generic leucovorin? I'll tell you – zero.* We have 40 dedicated salespeople promoting nothing, not ZEVALIN, just FUSILEV. In addition to that, we have their entire team of business solutions. We have people who make sure that reimbursement is not affected. We have just dedicated people, their managers, everybody just focused on selling ZEVALIN [*sic*].[17] They are calling on community doctors and hospitals throughout the country.

---

[17] Shrotriya uses "Zevalin" in error, as the entire paragraph makes clear that he is referring to "Fusilev" throughout.

> We also have a very sound pricing strategy. *We have not slashed our prices to woo doctors. Let me repeat that. In fact, our prices have been going up.* In first quarter, we increased the price 2%; in the second quarter, we again increased the price; and third quarter, *average sales price is higher than it has ever been.*

128.     These statements regarding the strength of, and future prospects for, the Fusilev business were false and misleading because of Shrotriya's failure to disclose that (1) Fusilev end-user demand was declining; and (2) Defendants were artificially inflating sales figures with bulk discounting and channel stuffing. *See* ¶¶90-102. Shrotriya's emphasis on the size of the patient population for mCRC, and his statements that accounts and repeat orders were increasing, were misleading because they implied that the Fusilev business continued to grow, when in fact sales and demand were declining. *See* ¶¶71-102. Shrotriya falsely stated that Spectrum had not discounted prices when it was offering bulk discounts to its distributors and stuffing their channels with inventory. *See* ¶¶101-102. Shrotriya further misled the market by pointing to eight previous quarters of strong Fusilev sales as proof that sales were continuing to be strong. He also misleadingly dismissed generic leucovorin as a threat because Fusilev had a dedicated sales force while leucovorin had "zero" sales personnel marketing it, even though he knew that Fusilev sales were deteriorating with the re-emergence of leucovorin. *See* ¶¶71-102.

129.     Shrotriya also misleadingly described the findings of the study in the Journal of Clinical Oncology. That study found no significant difference in median survival times (contrary to Shrotriya's statement that patients on Fusilev lived longer), and the study's main conclusion was that there was no significant difference between Fusilev and leucovorin, even with patients being given twice the dose of the active ingredient in the Fusilev arm. Nor did the study report, contrary to Shrotriya's assertion, that patients on generic Leucovorin needed the transfusion of growth factors to counter bone marrow suppression. *See* ¶¶43-45. Finally, Shrotriya misleadingly portrayed the Company's confidence in its business by emphasizing the stock

buyback program when internally Defendants knew Fusilev end-user demand was plummeting.[18]
*See* ¶¶71-102.

> F.    **September 20, 2012 UBS Global Life Sciences Conference**

130.    Shrotriya made the following false and misleading statements regarding Fusilev
and the strength of the Fusilev business at the September 20, 2012 UBS Global Life Sciences
Conference:

> We had record revenues last year, and we actually turned in $72 million in profit. And because of the cash we are generating, our Board authorized a buyback program. *And as of last month, we had bought – nearly 1 million shares we bought back for about $11.9 million, and retired them. That is our way of saying, adding shareholder value.*
>
> \*\*\*
>
> FUSILEV is a – the only branded folate analog approved for the treatment of metastatic advanced colorectal cancer. It is a pure isomer. It is levoleucovorin…. And as I said last quarter, we did about $56 million a year – $56 million in a quarter. It is approved for colorectal cancer. As you know, that colorectal cancer is the third most common cancer diagnosed in men and women. And it is second cause of cancer death.
>
> There is one study published in Journal of Clinical Oncology; it is a large, randomized trial published from Europe that showed that when you compare generic leucovorin, or the dextro-racemic mixture – dextro-levo mixture – and you compare it to FUSILEV of leucovorin, you find that there is a statistical significance in favor of FUSILEV. There is less Grade 3 and Grade 4 toxicities. *And, also, if you look at survival, it was eight months survival after FUSILEV treatment versus 6.25 months median time to progression or death.*
>
> In fact, FUSILEV was approved by the FDA only in April of last year. And it has quickly picked up market because of a shortage of leucovorin. *However, now we believe that FUSILEV is well-established, as number of accounts that have been ordering FUSILEV has kept growing.*

---

[18] Shrotriya sold 33,000 shares at artificially inflated prices on September 18, 2012, and another 33,000 shares at artificially inflated prices on September 19, 2012.

*And, also, as the shortage has been abating, our sales have been going up.* People question how much your sales can keep growing. Last year, $56 million – last quarter $56 million. Having done $153 million year before, right now we are averaging over $200 million. The question is, how much more can the sales keep growing? *We believe that $200 million, $250 million* is a very good base revenue from FUSILEV.

\*\*\*

As you will see that we have more accounts, and the account numbers has grown from 500 last year, at the end of the quarter, to 800 to 1200 to 1500. *A number of accounts that are ordering FUSILEV has been increasing, and, also, the number of accounts that have ordered – our reordering rate has also increased.*

\*\*\*

*Just to give you an idea, we increased price by about 2% in first quarter of this year. We again increased the price in second quarter, slightly.* And if you look at the average sales price of this drug has gone from $160, $170, to $180; and for the fourth quarter, it is like over $190. And average sales price directly reflects if there was any deep discounting in any quarter that would be reflected adversely in ASP. *Again, goes to prove that any rumors that are spread that Spectrum was deep-discounting drugs to woo doctors was wrong.* And I maintain that we have not – we have, in fact, given increases in prices.

131.    These statements regarding the strength of, and future prospects for, the Fusilev business were false and misleading because of Shrotriya's failure to disclose that (1) Fusilev end-user demand was declining; and (2) Defendants were artificially inflating sales figures with bulk discounting and channel stuffing. *See* ¶¶90-102. Shrotriya's emphasis on the size of the patient population for mCRC, and his statements that accounts and repeat orders were increasing, were misleading because they implied that the Fusilev business continued to grow, when in fact sales and demand were declining. *See* ¶¶71-102. Shrotriya falsely stated that Spectrum had not discounted prices when it was offering bulk discounts to its distributors and stuffing their channels with inventory. *See* ¶¶101-102. Shrotriya's statement that the Company expected $250

million in Fusilev sales for 2012 was also misleading, because he knew at the time he made that statement that Fusilev demand was declining and Defendants had been forced to channel stuff Fusilev inventory. *See* ¶¶71-102.

132.    Shrotriya also misleadingly described the findings of the study in the Journal of Clinical Oncology.    That study found no significant difference in median survival times (compared with Shrotriya's statement that patients on Fusilev survived longer), and the study's main conclusion was that there was no significant difference between Fusilev and leucovorin, even with patients being given twice the dose of the active ingredient in the Fusilev arm. *See* ¶¶43-45. Finally, Shrotriya misleadingly portrayed the Company's confidence in its business by emphasizing the stock buyback program when internally Defendants knew Fusilev end-user demand was plummeting.[19] *See* ¶¶71-102.

### G.    September 27, 2012 PropThink Interview

133.    Shrotriya made the following false and misleading statements regarding Fusilev during the September 27, 2012 PropThink Interview:

> **Interviewer**
>
> Fusilev is your lead product.  It's annualizing now at over $220 million.  Do you see this product continuing to grow at this kind of a clip?
>
> **Rajesh Shrotriya – Spectrum Pharmaceuticals, Inc. – Chairman, CEO and President**
>
> *Yes indeed.*  So Fusilev is now approved for the treatment of colorectal cancer, metastatic advanced colorectal cancer. Colorectal cancer is the second biggest diagnosed cancer for men and women in the United States.  There are more than 150,000 patients that are diagnosed with this disease.  And it is the third leading cause of death of cancer.  More than 50,000 patients die each year.  *So we believe that there's unmet medical need and*

---

[19] Shrotriya sold 4,800 shares at artificially inflated prices on September 20, 2012, the same day of the conference.

*Fusilev indeed we believe will continue to grow.   Currently we have only what – 29% market share.*   And we expect these sales to decline slowly – I mean, in terms of growth it will decline, growth will not be as rapid as we have seen in last year and a half. *However, we expect overall revenue to keep growing.*

**Interviewer**

So you expect it to continue to grow, but not quite at the same rate because the base of sales is much higher.   Another point of controversy is that generic Leucovorin, which is not the same as Fusilev, could come back on the market.   There's been a disruption in supply. *And that, some believe, is going to significantly impact the launch ramp, or the ramp, of Fusilev.   Can you talk a little [bit] about that and what your feelings are about Fusilev relative to generic Leucovorin coming back to the market.*

**Rajesh Shrotriya – Spectrum Pharmaceuticals, Inc. – Chairman, CEO and President**

…The generic Leucovorin is not generic of Fusilev.   Fusilev is a different drug, approved under a New Drug Application by the FDA, for two indications…. If you look at generic drug, which is a mixture of dextro form and levo form, is a 50-50 mixture.   It was approved by the FDA in 1953.   That's about 60 years ago…. That generic Leucovorin is not generic of Fusilev.

Number two, Fusilev…has its own J code.   And what J code means is that FDA and the government, CMS, understand that this is a new drug, based on its own data packet has been approved for the treatment of colorectal cancer, and companies can price it accordingly.   So there is a difference in pricing between generic Leucovorin and Fusilev….

Secondly, if you think why is the shortage of generic drugs on and off.   There are generic manufacturers who compete with each other, trying to sell a penny cheaper than the next guy…. *They don't support the drug.*   They don't do any clinical trials. *They don't have a detailed sales force.*   They actually, many companies bundle Leucovorin with other drugs. *In contrast, at Fusilev we have a 40-people dedicated sales force promoting Fusilev to colorectal cancer doctors.   And we have a whole army of people supporting it….*   So we are supporting the brand that there is no way generic companies can support.   And again, once again to say that *generic Leucovorin is a different drug than Fusilev.*

\*\*\*

**Interviewer**

You mentioned that you have the ability to raise price under a J code. And there's been some talk out there that you've been cutting price, in fact, to gain market share in advance of generic Leucovorin coming back to the market. What can you say about that?

**Rajesh Shrotriya – Spectrum Pharmaceuticals, Inc. – Chairman, CEO and President**

*So I will tell you very emphatically that Spectrum has neither reduced prices of Fusilev, nor have given huge discounts to woo doctors to prescribe Fusilev. In fact, we have increased prices.* In first quarter we raised price up 2%. And in second quarter we increased price again, a price between 2 and 6%. And in third quarter the average sale price is higher than it was in previous quarters. And in fact we expect prices in Q4 to be even higher.

134.    These statements regarding the strength of, and future prospects for, the Fusilev business were false and misleading because of Shrotriya's failure to disclose that (1) Fusilev end-user demand was declining; and (2) Defendants were artificially inflating sales figures with bulk discounting and channel stuffing. *See* ¶¶90-102. Shrotriya's emphasis on the size of the patient population for mCRC and his statements regarding "unmet medical need" and that Fusilev revenue would continue to grow were misleading because they implied that the Fusilev business remained robust, when in fact sales and demand were declining. *See* ¶¶71-102. Shrotriya misleadingly stated that Spectrum had not discounted prices when in fact it was offering bulk discounts to its distributors and stuffing their channels with inventory. *See* ¶¶101-102.

135.    He also misleadingly dismissed generic leucovorin as a threat because Fusilev had an "army" of sales personnel supporting it while leucovorin had no such dedicated sales force, even though Fusilev sales were deteriorating with the re-emergence of leucovorin. Shrotriya further failed to disclose that he knew the increasing availability of leucovorin was causing Fusilev sales and demand to decline. *See* ¶¶71-102. Shrotriya misleadingly emphasized that

Fusilev was a "new" and "different" drug from leucovorin, when doctors, studies, and Spectrum's own sales force viewed the two drugs as essentially interchangeable – a view supported by the deleterious effect that increased supplies of cheaper leucovorin had on Fusilev sales and demand. *See* ¶¶43-46, 48-50, 57-58.

### H.      October 9, 2012 BIO Investor Forum

136.     Shiv Kapoor, VP of Strategic Planning, made the following false and misleading statements on behalf of Spectrum regarding Fusilev and the strength of the Fusilev business at the October 9, 2012 BIO Investor Forum:

> So first, on FUSILEV, FUSILEV is the only branded folate analog approved for metastatic colorectal cancer.... *Colorectal cancer is the third-most frequently diagnosed cancer in men and women, about 140,000 new cases every year.*
>
> \*\*\*
>
> If you look at the Phase III efficacy and safety results from FUSILEV, and this is a study that compares head-to-head FUSILEV and leucovorin, it's pretty clear to see some differences. The pure isomer, FUSILEV, as a median time to progression or death was eight months compared to 6.25 months for leucovorin. When you look at the side effect and safety profile, there were fewer grade 3 and 4 tox associated with FUSILEV, especially if you look at leukopenia and granulocytopenia, there is even a statistical significance in the difference in these safety results. And this data is from 200 – a study from 240 patients. *And that's why we believe the drug is a great clinical profile.*
>
> So what is FUSILEV's growth strategy? We've had strong growth in the franchise because of FUSILEV's purity, *because of its clinical profile* and supply of reliability. We have also developed very good relationships with our customers. And one of the reasons for that is we've built a very strong infrastructure behind FUSILEV. *There is a very robust account penetration. Every quarter in the past three quarters, we have announced more and more accounts using FUSILEV. We've also had a very sound pricing strategy and we have taken two price increases this year,* one in Q1 and one in Q2.

And all these factors have helped us grow FUSILEV. A lot of times, people will ask me – this is great, *but with generic leucovorin coming in,* or more supplies of generic leucovorin coming in, *how will you be able to grow FUSILEV?* And so the answer is, really, the generics have really been in the market for the past five years. And they have not really been reliable.... So the reliability is a problem, and with FUSILEV we have really not had that.

So how will we grow FUSILEV? There will probably be more generic competitors making leucovorin, but there have always been three or four competitors making generic leucovorin. And maybe there will be a fifth one this quarter, and maybe there will be more next year. But there is a certain clientele who prefers a pure drug, *a drug with a good clinical profile* and a drug that is reliable in supplies, and those customers will use our drug.

So we believe there are three growth drivers for FUSILEV, and they will continue to help us grow FUSILEV. And those three are – *we can continue to grow our market share.* We currently have less than 30% market share and we can continue to grow that. We can continue to grow the market for folate analogs. This market has actually dwindled and come down over the past five years. *Because of the shortage of leucovorin, physicians have started using less leucovorin in their patients....* And the third one is obviously pricing, and we've talked about that. So all these three drivers will help us grow FUSILEV.

137.    These statements regarding the strength of, and future prospects for, the Fusilev business were false and misleading because of Kapoor's failure to disclose that (1) Fusilev end-user demand was declining; and (2) Defendants were artificially inflating sales figures with bulk discounting and channel stuffing. *See* ¶¶90-102. Kapoor's emphasis on the size of the patient population for mCRC, and his statements that accounts were increasing and that Spectrum had "good relationships" with its customers were misleading because they implied that the Fusilev business continued to grow, when in fact sales and demand were declining. *See* ¶¶71-102. Kapoor misleadingly stated that Spectrum had raised Fusilev prices without disclosing that Defendants were in fact offering bulk discounts to the Company's distributors and stuffing their channels with inventory. *See* ¶¶101-102. Kapoor's statements regarding generic leucovorin in

the market were misleading because they failed to disclose that the increasing availability of leucovorin was causing Fusilev sales and demand to plummet.   Kapoor's statement that "physicians are using less leucovorin in their patients" is similarly false. *See* ¶¶90-102.

138.   Kapoor's statements regarding the findings of the study in the Journal of Clinical Oncology, combined with his statements that Fusilev had a "good clinical profile" were also misleading because they implied that Fusilev had a better clinical profile than leucovorin when that study had concluded that there were no significant differences between the two drugs, even when patients were given with twice the effective dose of active ingredient in the Fusilev arm of the study. *See* ¶¶43-45.[20]

I.   **November 7, 2012 3Q 2012 Earnings Call**

139.   The November 7, 2012 earnings call contained the following false and misleading statements regarding Fusilev and the strength of Spectrum's Fusilev business:

> **Ken Keller - Spectrum Pharmaceuticals, Inc. - COO**
>
> *Importantly, FUSILEV demand remains strong despite readily-available supplies of generic leucovorin.* Market research shows that 75% of physicians say that generic leucovorin is available without difficulty. *It is clear that physicians are continuing to choose FUSILEV even when other options are available. This quarter there was a 13% increase in the number of accounts ordering FUSILEV.* When we look at market penetration over the past 12 months, *FUSILEV penetration is up from 29% in the last quarter to 31% in this quarter, and we believe there is room for improvement.*
>
> A recent market survey suggested that 60% of physicians treating colorectal cancer patients have not yet been contacted by a Spectrum sales representative. We can and we will change that....
>
> Total sales headcount will exceed 60 people, which essentially doubles the number of sales professionals promoting all three of our drugs.

---

[20] Shrotriya sold 11,350 shares at artificially inflated prices on October 9, 2012, the same day of the conference.

\*\*\*

### Adnan Butt - RBC Capital Markets - Analyst

I'll begin with the FUSILEV. Of course, can you expand a bit more on the down sequential quarters? How do we reconcile that with share being up and market penetration being up? And then, secondly, if my (inaudible) math is correct would you expect, based upon the pro forma guidance given, for FUSILEV to be up sequentially in the fourth quarter?

### Raj Shrotriya - Spectrum Pharmaceuticals Inc - Chairman, CEO and President

Adnan, as we said in the past, net sales will fluctuate based on timing of orders from wholesalers. *What we watch and monitor very closely is underlying end-user demand. Underlying demand is stable. In fact, the number of accounts ordering Q3 were the highest ever, as stated by Ken. We have more accounts ordering today than ever before.* Our research shows that the large majority of physicians report that [generic] Leucovorin is not difficult to obtain, so this demand is not solely driven by lack of other options, and we see that there are ways to further penetrate this market. Ken further stated that more than 60% of doctors have not yet been called upon by our doctors*, so we expect our sales of FUSILEV to remain strong and keep growing quarter after quarter and year after year.*

\*\*\*

### Joe Pantginis - ROTH Capital Partners - Analyst

While you continue to grow the FUSILEV franchise I wanted to see if you can add some additional color regarding – especially when you're doing all of these different surveys – what competitive pressures you are seeing and specifically might anticipate, especially from the newly approved drug from Sagent [new leucovorin manufacturer]?

### Raj Shrotriya - Spectrum Pharmaceuticals Inc - Chairman, CEO and President

....[T]ypically generic companies compete with themselves. In fact, I'm looking for a day when the market is over-flooded with all generic Leucovorin supplies and they fight with each other and kill each other and *Spectrum's FUSILEV will keep performing on its growth trajectory that it has been doing in the past.* And all the naysayers, *all the people who believe that somehow FUSILEV*

60

*sales are going to go fall off the cliff, we have proven them wrong for eight quarters* and you must take my word for it. *We have proved it forever.*

FUSILEV is... a pure isomer, there are benefits. Doctors will see no need to use a cheaper product. Of course, there are hospitals and there are patients who would use a cheaper brand and generics are here to stay, but FUSILEV is also here stay.... *anybody who says that Spectrum's discounting drugs, they're wrong* because, in fact, our ASP has been going – quarter after quarter ASP has been going up.

That shows that *Spectrum, in fact, has not discounted* and any anomaly that they're seeing the sales from (inaudible) data are here or there is primarily because if we sell FUSILEV to government hospitals there is a government mandated price at which we have to sell.

\*\*\*

### Difei Yang - WallachBeth Capital - Analyst

...So FUSILEV, with Sagent launching their generics and possibly Teva comes back to market, it sounded like – if I hear you correctly, it sounded like your is (inaudible) losing major market share is back to the generics. Could you help us understand why this time around it might be difference from previous times where when the generics comes back to market, essentially the FUSILEV revenue tanked?

### Raj Shrotriya - Spectrum Pharmaceuticals Inc - Chairman, CEO and President

*So, Difei, actually your observation is not quite correct, it really is really wrong. The only time the sales of FUSILEV went down that was before Spectrum got approval for colorectal cancer. That was before 2011.* So if you go back and look, FDA had given us a special permission to promote drug, sell drug for CRC before we got approval in 2010. Sales went down because we couldn't promote it, we couldn't even send it to the doctors even if they ordered it, because we were not approved. *FDA turned the tap on and off.*

... So what you are talking about the sales went down when the generic came up, that was because the FD – because we could not sell the drug at that time. Since April 2011 it is a different story. *Our sales have never, ever gone down; they have gone only one way, going up.*

61

140.    These statements regarding the strength of, and future prospects for, the Fusilev business were false and misleading because of Defendants' failure to disclose that (1) Fusilev end-user demand was declining; and (2) Defendants were artificially inflating sales figures with bulk discounting and channel stuffing. *See* ¶¶90-102. Defendants falsely stated that Fusilev demand "remained strong" and that sales would continue to grow even as generic leucovorin became increasingly available, when they knew that the increased supplies of leucovorin was causing Fusilev sales and demand to decline. Defendants' statements regarding Fusilev's increasing market penetration, the increasing number of accounts ordering Fusilev, and their expectation that there was "room to grow" were misleading for the same reason. *See* ¶¶71-102.

141.    Shrotriya misleadingly dismissed generic leucovorin as a threat, pointing to previous quarters' growth as "proof" that Fusilev would continue to grow and falsely stating that sales had "never, ever gone down," even though he knew Fusilev sales were deteriorating with the re-emergence of leucovorin. *Id.* Shrotriya also falsely asserted that Spectrum was not discounting Fusilev, when Defendants were offering bulk discounts to distributors to disguise declining end-user demand. *See* ¶¶101-102.

142.    Shrotriya's statements regarding the previous inverse relationship of Fusilev sales to leucovorin availability were misleading because he falsely asserted that the inverse relationship no longer applied post-April 2011 (after Spectrum received approval for mCRC and could actively market Fusilev), when he knew that Fusilev demand was declining with increasing availability of leucovorin in the fall of 2012. *See* ¶¶71-102. Finally, Shrotriya's statements that "[w]hat we watch and monitor very closely is underlying end-user demand. Underlying demand is stable. In fact, the number of accounts ordering Q3 were the highest ever," were directly

contrary to the facts that underlying end-user demand was declining, resulting in channel-stuffed

inventories backing up at Spectrum's distributors. *See* ¶¶90-102.

143. Analysts noted the purported strength of Fusilev sales in the context of stable

leucovorin supply and the purported potential to grow market share with a revamped sales force.

A November 8, 2012 RBC Capital Markets report stated:

> *While sales have been resilient and even grown in light of stable leucovorin supply*, the addition of even more leucovorin could create some volatility. Our 4Q:12 and 1Q:13 Fusilev estimates are down sequentially but they begin increasing in 2Q:13. We believe a Fusilev run rate of ~$50M/quarter would be upside to our and Street expectations.
>
> ....In addition to the potential negative pressure from increased leucovorin supply, several drivers could act as possible positive levers including: 1) 60% of physicians that still need to be called upon, 2) more hospitals than expected using Fusilev, and 3) greater shift in use to the community setting, something the salesforce should be able to deliver, in our view.

144. A November 8, 2012 Roth Capital Partners report stated:

> *Market penetration for Fusilev was ~31% compared to ~29% in 2Q12.* Spectrum anticipates proforma revenue for 2012 of >$300 million (including ~$37 million for Folotyn for the first 9 months of 2012).... The redesigned commercial team under new COO Ken Keller includes a salesforce of ~60 people trained to promote all 3 drugs. With six regional sales managers in place, Spectrum's commercial operations are set to expand geographical reach and ability to address customer needs....
>
> *We continue to expect sustained profitability and product revenue growth for Spectrum, driven primarily by Fusilev.* Management commented that 75% of surveyed physicians believe that generic leucovorin is readily available; however, we believe that the push and pull battle is set to remain over the next quarters, with the key bear case estimating a drop off in revenue based on the return of a "more stable" leucovorin supply.

**J.** **November 15, 2012 Credit Suisse Group AG Healthcare Conference**

145. Shrotriya made the following false and misleading statements regarding Fusilev and the strength of the Fusilev business at the November 15, 2012 Credit Suisse Healthcare Conference:

> It is only in 2011 when... FUSILEV was finally approved for colorectal cancer that from then on *the last eight quarters our sales of Spectrum – of FUSILEV have been consistently growing.* And they are now averaging about $200 million a year.
>
> ....Colorectal cancer is the third commonest cause of cancer in the United States and is the second-leading cause of cancer death in men and women in the United States.
>
> There is a data published in Journal of Clinical Oncology that shows that in a head-to-head trial done with FUSILEV and generic leucovorin FUSILEV offers a statistically significant difference in the safety profile of this drug in this study. You will see the difference between the FUSILEV-treated patients and generic leucovorin-treated patients that is statistically significant difference in favor of FUSILEV.
>
> *Also on survival, the patients on leucovorin were living like 6.25 months median time to progression or death, whereas in FUSILEV patience were living nearly 1.5 months longer.*
>
> As you will see, our FUSILEV sales have been growing consistently quarter after quarter. The reason for that is that *we have more clinics, more clinicians, and more physicians ordering FUSILEV quarter after quarter.* In fact, our estimate is that in last quarter 31% penetration has occurred of our drug and *there are more accounts ordering. Repeated orders are coming for FUSILEV.*

146. These statements regarding the strength of, and future prospects for, the Fusilev business were false and misleading because of Shrotriya's failure to disclose that (1) Fusilev end-user demand was declining; and (2) Defendants were artificially inflating sales figures with bulk discounting and channel stuffing. *See* ¶¶90-102. Shrotriya's emphasis on the size of the patient population for mCRC, and his statements that "more and more physicians" were ordering Fusilev

"quarter after quarter," and that repeat orders were increasing, were misleading because they implied that the Fusilev business continued to grow, when in fact sales and demand were declining. *See* ¶¶71-102.

147.  Shrotriya also misleadingly described the findings of the study in the Journal of Clinical Oncology.   That study found no significant difference in median survival times (contrary to Shrotriya's statement that patients on Fusilev survived longer), and the study's main conclusion was that there was no significant difference between Fusilev and leucovorin, even with patients being given twice the dose of the active ingredient in the Fusilev arm. *See* ¶¶43-45.

**K.      December 12, 2012 Oppenheimer Holdings Inc. Healthcare Conference**

148.  Shrotriya made the following false and misleading statements regarding Fusilev and the strength of the Fusilev business at the December 12, 2012 Oppenheimer Healthcare Conference:

> FUSILEV is a differentiated, only branded folate analog that is approved for metastatic colorectal cancer. Colorectal cancer is the third-most frequently diagnosed cancer in men and women, and it is the second-leading cause of cancer death in men and women in the United States.
>
> [T]his latest study that was published in JCO that shows in a head-to-head comparison against generic leucovorin, which is a mixture of dextro form and levo form, a 50-50 mixture, it shows that *the patients on FUSILEV live longer and, in fact, they had less side effects.* It is statistically significant, less side effects. *Some of the side effects even required blood transfusion or a need for giving growth factors.*
>
> *FUSILEV sales have kept growing ever since we launched it...* \The latest sales have kept saying that FUSILEV sales are going to disappear. *In fact, we have proven them wrong for the last eight quarters, and we are still proving them wrong.* In fact, we have now penetrated over 31% is our market share on a milligram basis. *We have more accounts that are now ordering ZEVALIN* [sic],[21]

---

[21] Shrotriya uses "Zevalin" in error, as the entire paragraph makes clear that he is referring to "Fusilev" throughout.

*and they are accounts that have ordered ZEVALIN* [sic][22] *before. There are more repeat orders....*

*Our average sales price for drug has gone consistently up for FUSILEV.*

\*\*\*

....Last year we did $152 million in revenue, *and this year I expect our revenue will be well over $200 million.*

\*\*\*

**Unidentified Audience Member**

I was curious about pricing and pricing discounts. *Are you being forced to offer discounts to larger groups*?

**Rajesh   Shrotriya   -   Spectrum   Pharmaceuticals,   Inc.   - Chairman, CEO & President**

*We do not give any special discounts.* Whatever discounting is practiced in the health industry, that's all we do.

\*\*\*

Yes. So I will tell you clearly with respect to FUSILEV...*I expect that we have seen that quarter after quarter there are more new accounts ordering FUSILEV, and the people have ordered before them more repeat orders. And our penetration is higher.*

So, for example, the quarter before our penetration is about 29%. Now the penetration is about 31%, and *we have more and more people ordering FUSILEV....*

*[W]e are seeing more and more customers are ordering drugs, and our volume and sales are growing,* as you can see.

*...[I]f you look at the trends that I showed you, the annual trend of sales will keep growing,* as we have seen, and *we expect sales to continue to grow in 2013 and 2014.*

149.    These statements regarding the strength of, and future prospects for, the Fusilev

business were false and misleading because of Shrotriya's failure to disclose that (1) Fusilev end-

---

[22] Shrotriya uses "Zevalin" in error, as the entire paragraph makes clear that he is referring to "Fusilev" throughout.

user demand was declining; and (2) Defendants were artificially inflating sales figures with bulk discounting and channel stuffing. *See* ¶¶90-102. Shrotriya's emphasis on the size of the patient population for mCRC, his statements that "we have more and more people" ordering Fusilev, that "volume and sales are growing," and that repeat orders were increasing, were misleading because they implied that the Fusilev business was robust when in fact he knew sales and demand were declining at the time. *See* ¶¶71-102. Shrotriya also flatly denied offering bulk discounts when he knew Defendants were offering bulk discounts to their distributors to conceal declining sales and end-user demand. *See* ¶¶101-102.

150. Shrotriya also misleadingly described the findings of the study in the Journal of Clinical Oncology. That study found no significant difference in median survival times (contrary to Shrotriya's statement that patients on Fusilev survived longer), and the study's main conclusion was that there was no significant difference between Fusilev and leucovorin, even with patients being given twice the dose of the active ingredient in the Fusilev arm. Nor did the study state that side effects in the leucovorin arm "required blood transfusion or a need for giving growth factors." *See* ¶43-45.[23]

**L.    January 9, 2013 JP Morgan Global Healthcare Conference**

151. Shrotriya made the following false and misleading statements regarding Fusilev and the strength of the Fusilev business at the January 9, 2013 JP Morgan Healthcare Conference:

> We have generated profits quarter-after-quarter for eight quarters in a row. In fact, in third quarter alone, last – in Q3, we had more revenue and more profits than ever before.... *We expect our growth to continue in 2013....*
>
> \*\*\*

---

[23] Shrotriya sold 172,507 shares at artificially inflated prices on December 28, 2012 and 205,836 shares at artificially inflated prices on December 31, 2012.

> *The question is always asked, can FUSILEV continue to grow? Our absolute answer is absolutely yes.*
>
> What is the opportunity with FUSILEV? Today, approximately 50% of key accounts have purchased FUSILEV and many key physicians have been reached. There is obviously a lot of green open pasture we haven't touched yet. *When we conducted a survey, more than 50% doctors said that they have never, ever been called by a Spectrum oncology specialist yet. And that's where we see the opportunity.*
>
> So the opportunity exists. Here is how we plan to capture this opportunity. Remember, FUSILEV is a unique product. It's a pure isomer. It is given in one-half the dose and it has a unique J-code. It's fully reimbursed....
>
> Our sales organization for the first time is focusing on promoting all three drugs at the same time. *There is not a single salesperson of any company that talks about the racemic [generic] picture.*
>
> .... But FUSILEV can be prescribed by almost every oncologist. FUSILEV has been – leucovorin has been around for more than 60 years. However, the FUSILEV was approved by the FDA on April 28, 2011. So we have just touched the surface. We have penetrated about 31% of the market at this time, *and we believe there is a lot of room to grow.*

152.     These statements regarding the strength of, and future prospects for, the Fusilev business were false and misleading because of Shrotriya's failure to disclose that (1) Fusilev end-user demand was declining; and (2) Defendants were artificially inflating sales figures with bulk discounting and channel stuffing. *See* ¶¶90-102. Shrotriya's emphasis on profits the last "eight quarters in a row," coupled with his statement that the Company had more revenue in Q3 2012 "than ever before" and that he expected growth to continue in 2013, were misleading because he knew that Fusilev sales and demand were declining, and that the Q3 2012 revenue numbers were based on undisclosed, heavily discounted bulk purchases to distributors.   *See* ¶¶71-102. Shrotriya's statements regarding Fusilev as "unique" were also misleading because physicians and Spectrum's sales force regarded Fusilev as interchangeable with the lower cost leucovorin.

*See* ¶¶43-46, 48-50, 57-58.  Similarly, Shrotriya misleadingly dismissed leucovorin's threat to –

and negative impact on – Fusilev sales, by stating that Fusilev had a dedicated sales force while

"not a single salesperson" was promoting leucovorin.

### M.  **February 21, 2013 4Q 2012 Earnings Call**

153.    The February 21, 2013 earnings call contained the following false and misleading

statements regarding Fusilev and the strength of the Fusilev business:

> **Raj Shrotriya - Spectrum Pharmaceuticals Inc - Chairman, CEO and President**
>
> 2012 was another transformative year of growth.... our product sales grew over 40% in 2012....
>
> Last year, *FUSILEV grew 56% in unit volume and 33% in dollar sales. FUSILEV demand remains strong*, and we continue to see opportunities to expand its use.
>
> \*\*\*
>
> **Ken Keller - Spectrum Pharmaceuticals Inc - Executive VP and COO**
>
> As Dr. Raj stated, 2012 was a transformative year for us and we're off to a strong start in 2013. I'll begin my remarks with a focus on the FUSILEV franchise. Total revenue in 2012 increased 33% to over $200 million. *In Q4, we shipped more units of FUSILEV than we did in Q3*; however, as Brett stated, net revenue was down Q4 over Q3. *The increase in total units was more than offset by an increase in the gross to net adjustments. The majority of this was attributable to an increase in government mandated discounts.*
>
> *In the second half of 2012, our FUSILEV business shifted more towards accounts qualified for government pricing, especially 340B purchasing.* While in 2012, FUSILEV unit sales increased approximately 56% over 2011, government rebates, inclusive of 340B chargebacks, increased approximately tenfold, from $3.8 million in 2011 to $47.3 million in 2012.... [A]pproximately 75% of total FUSILEV business resides in the clinic segment. This creates a very strong base of FUSILEV business on which we can build upon and focus our promotional efforts against.
>
> To reinforce this, *I'm pleased to share with you that the number of clinics purchasing FUSILEV continues to grow and end-user*

*demand year-to-date in 2013 is higher than in December of 2012. We expect this trend to continue throughout 2013.* In addition, discounts outside of those that are government mandated remains low.

\*\*\*

So when we look at FUSILEV business right now, what we see is *end-user demand, customer generated demand is very, very stable* right now. In fact, when you look at the first few weeks of this year, *and we have data all the way through January, the demand is actually higher than it was in December. So we feel that the underlying demand is very stable.* Net purchasing patterns do change, but *the underlying demand is very, very solid.*

The second point I think that will help to clarify it is today, 75% of FUSILEV business is in the clinic setting. That is a setting that is very, very sticky for FUSILEV. *Once accounts are using this product, it is very rare rarely do they go back to generic Leucovorin.*

### Raj Shrotriya - Spectrum Pharmaceuticals Inc - Chairman, CEO and President

....We expect – *with the strength we are seeing in January, and we are seeing the new accounts and the reorders from the old accounts, that we expect that 2013 revenues to continue to grow and we expect our sales to be higher than we had in 2012.*

\*\*\*

In fact, Ken talked about the fact that *we had conducted a survey of our own, and we found that nearly 50% of the doctors have not yet been tested by a Spectrum sales representative and have never used FUSILEV. That's where we see the upside potential....*

### Ken Keller - Spectrum Pharmaceuticals Inc - Executive VP and COO

...In the last quarter, Joe [Turgeon] has really rebuilt the team and today, we – our team is fully staffed, as opposed to last year where we had 15, 20 people selling our products. *Today, we have over 60 people selling our products and that's going to allow us to reach those doctors we haven't touched before.*

\*\*\*

70

**Ken Keller - Spectrum Pharmaceuticals Inc - Executive VP and COO**

....*[T]he number of FUSILEV files that we shipped out was up in Q4 versus Q3....*

\*\*\*

**Ken Keller - Spectrum Pharmaceuticals Inc - Executive VP and COO**

[T]oday, *and at least for the past three or four months, the ability for any doctor to get generic glycaemic Leucovorin has been fairly easy.* Our research shows that definitively. Right now, there's not a difficulty in getting the product. *Therefore, if there are new generics that enter the market, we don't think that's going to impact us much.*

If it's easy, it's easy; it doesn't make a difference. So I don't think that's going to be an issue at all. What we see when clinics use FUSILEV, they love the idea that it has a separate J-code. They find reimbursement very, very easy; they love the idea that it's a pure isomer. *So once they've got it, they're very reluctant to switch back, and we see that consistently, almost universally in the clinic business.* So we don't think that *if there are two or three more generics that hit the market in the next six months, we don't see it affecting us much.*

\*\*\*

**Difei Yang - WallachBeth Capital - Analyst**

....So with this generic Leucovorin come back to market, do you see any impact at all with regards to the three different customer segments? And if there's any impact, where do you see the most impact and how is it impacting?

**Ken Keller - Spectrum Pharmaceuticals Inc - Executive VP and COO**

Thank you for the question. *So generic Leucovorin, as you know, is readily available right now. So if more comes back to the market, we don't think it's going to affect us to any great degree....* The people that prefer and the accounts that prefer FUSILEV, our job is to solidify that business and *we think that business is very sticky right now.*

154.     These statements regarding the strength of, and future prospects for, the Fusilev business were false and misleading because of Defendants' failure to disclose that (1) Fusilev end-user demand was declining, resulting in channel-stuffed inventories at distributors backing up; and (2) Defendants were artificially inflating sales figures with bulk discounting and channel stuffing. *See* ¶¶90-102. Keller's statements regarding "end-user demand, customer generated demand [being] very, very stable right now," that "data all the way through January, the demand is actually higher than it was in December," and Defendants' statements that the clinic business was "sticky" were false because channel-stuffed inventories at distributors were backing up from lack of end-user demand. *See* ¶¶71-102. Defendants' statements regarding growth in 2012, including their figures on Fusilev units shipped, were false and misleading because they failed to disclose that those figures were based on discounted bulk sales to distributors that hid the actual decline in end-user demand. *See* ¶¶101-102.

155.     Defendants' statements that the gross-to-net discrepancy was due to an increase in sales to 340B hospitals were also false, and designed to conceal the bulk discounts they were using to stuff inventories at distributors. *Id.* Defendants' statements that Fusilev sales had remained strong even while leucovorin had been readily available over the past several months, and that increasing generic availability would not impact Fusilev sales, were false because Defendants knew that Fusilev sales had declined in proportion to the increasing availability of leucovorin in the fall of 2012. *See* ¶¶71-102. Finally, Defendants' statements regarding their revamped sales force, the growth potential in the Fusilev business, and Shrotriya's statement that Fusilev would grow even more in 2013 than in 2012 were misleading because Fusilev demand was plummeting. *Id.*

72

156.   Analysts focused on the fact that despite generic availability, Fusilev sales remained purportedly strong. A February 21, 2013 RBC Capital Markets report stated:

> 4Q:12 results are solid and should trends hold for 1Q:13 and through 2Q:13 we expect shares to appreciate. *Despite additional leucovorin, Fusilev has not fallen off a cliff*…and *SPPI's guidance is for higher total revenues and operating income*….

> Fusilev trends positive based on: 1) *Stable and growing* purchasing patterns and higher end user demand higher in 1Q:13, 2) 75% of Fusilev use in the clinic setting (up from. mid-60s%), and 3) *Expected growth from 50% of physicians not yet contacted, despite a likely stable if not increased leucovorin supply.* The headwind to 4Q:12 sales was increased gross-to-net from more purchases from 340B hospitals; however, *the metric to focus on is unit growth, which increased.*

157.   A February 22, 2013 Roth Capital Markets report stated:

> Fusilev unit volume saw mid single digit increases between 3Q and 4Q…. *As surveys conducted by SPPI suggest that generic leucovorin is available, demand for Fusilev remains "stable". The drug remains "sticky", as community clinics do not appear to revert to the generic once they used Fusilev. The company expects continued growth of Fusilev sales in 2013,* and is set to continue its new marketing strategy….

> *We do not prescribe to the "Fusilev cliff" thesis* given 1) SPPI's revamped sales initiatives 2) generic leucovorin is not actively marketed, and while available, supply interruptions may still occur 3) financial benefit to doctors prescribing Fusilev.

158.   A February 27, 2013 RBC Capital Markets report relayed further false and misleading statements, similar to those Defendants made on the 4Q 2012 earnings call, at the RBC Healthcare Conference:

> *Reiterated guidance* of Y/Y gains in total revenues and operating income.

> ***

> *Leucovorin supply has increased* with Sagent, TEVA importing and APP production. *Despite this, unit sales are up* though revenues are impacted by 340B hospitals. Three buckets of Fusilev

73

> customers: 1) private practice clinics, 2) General hospitals and 3)
> Government hospitals. Of note 75% of recent sales are to
> *community docs (bucket #1) where sales are expected to be
> sticky…*

## VII.   **THE TRUTH IS REVEALED**

159.   Only *two weeks* after Defendants "reiterated guidance" at the RBC Capital

Markets Healthcare conference, Spectrum shocked the market with an abrupt about-face.  The

Company issued a press release and Form 8-K on March 12, 2013 after the market closed,

acknowledging that Fusilev sales for 2013 would be drastically lower than previously stated due

to the "recent stabilization" of the folate analog market, *i.e.*, the re-emergence of generic

leucovorin:

> *Based upon recent communications with customers, Spectrum
> Pharmaceuticals anticipates a change in ordering patterns of
> FUSILEV following the recent stabilization of the folate analog
> market. The Company now expects that FUSILEV sales will be
> approximately $10 to $15 million for the first quarter of the year,
> and approximately $80 to $90 million for the 2013 fiscal year.* The
> Company noted that, while hospital sales are shifting to generics,
> the end-user demand for FUSILEV remains stable in the clinics,
> and the Company continues to anticipate solid demand in this
> segment in 2013. The Company believes the majority of the impact
> from the change in ordering patterns will be reflected in the first
> half of 2013 and expects to return to a run-rate that more closely
> aligns with end-user demand by the end of the year…. Spectrum
> Pharmaceuticals anticipates total company revenues in the range of
> $160 to $180 million for the full-year 2013.

160.   In response, on March 13, 2013 Spectrum's stock price plummeted *over 37%* on

unusually heavy trading volume, with 22,555,500 shares traded compared with an average daily

trading volume over the Class Period of 1,148,078 shares.

161.   Analysts denounced the abrupt reversal.  A March 12, 2013 Credit Suisse report

stated:

> We do not recommend investors buy SPPI until we have greater
> visibility on Fusilev sales, *as current guidance could prove*

74

*inaccurate*. We also expect many investors to exit the stock.... *Management has an uphill battle to regain credibility*: While the current disclosure was timely and the guidance was detailed, *investors are concerned by the lack of visibility that the company had on its recent earnings call in late February*.

\*\*\*

SPPI provided sales guidance which included:

$10-15M in Q1 Fusilev sales. *This implies a 66-78% sequential decline*. SPPI believe[s] this will be the low point for the year, as [distributors] reduced inventory, and end user demand in hospitals declined.

$80-90M in 2013 Fusilev sales. This implies that H2 sale return to a "normalized" level of approximately $25M. If one assumes $50M in sales in H2:13 and $12.5M in Q1 (mid-point of range), then Q2 would need to be $17.5M to hit the bottom end of guidance. *We believe there will be significant investor skepticism regarding this forecast, given the surprise Q1 result.*

\*\*\*

*The hit to Q1 sales (down 66% to 78%) was far more dramatic than anticipated. This was particularly surprising following the recent year-end earnings call (in late February), where the company cited solid demand in oncology clinics.*

The company provided the following explanations.

End user demand. *SPPI tracks end users demand.* They report stable demand from clinics and believe the run rate from that channel is approximately $25M/quarter. According to SPPI management, Fusilev use in hospitals is declining faster than originally anticipated.

Wholesaler purchasing caused the shortfall. SPPI reported that wholesale distributers did not reorder in Q1, resulting in the substantial drop in sales. The stated reason was that they wanted to take a "watch and wait" approach in light of new generic leucovorin supply before gauging next quarter's demand. Wholesalers had sufficient inventory to skip an ordering cycle. SPPI expects that wholesaler purchasing will once again match end user demand ($25M or more) in H2:13.

162.  A March 13, 2013 RBC Capital Markets Report stated:

> *SPPI's unexpected lowering of 2013 Fusilev sales and revenue guidance could cast doubts on management's visibility into Fusilev dynamics....* Our new forecasts reflect these changes but not a buyback.

> What changed between late February and now? Our positive thesis hinges on new management, who instituted systematic sales analysis, targeting, and selling efforts, which could still bear fruit. Where SPPI seems surprised: 1) wholesaler destocking (four customers comprise 84.8% of sales); and 2) pace of hospital decline. *Where we are taken by surprise is the timing of this announcement given prior positive commentary on purchasing patterns and end-user demand.*

163.  In its May 9, 2013 1Q 2013 10Q, Spectrum revealed that it was under an SEC investigation related to its March 12, 2013 disclosure:

> **SEC Subpoena**

> On April 1, 2013, the Company received a subpoena from the SEC for documents pursuant to a formal order of investigation. The subpoena followed the Company's March 12, 2013 announcement that it anticipated a change in ordering patterns of FUSILEV. The Company is cooperating with the SEC investigation. The Company cannot predict when the SEC will conclude its investigation or the outcome of the investigation

## VIII.  ADDITIONAL SCIENTER ALLEGATIONS

164.  During the Class Period, Shrotriya reaped the rewards of Defendants' fraud while Spectrum's stock price was artificially inflated.  As shown in the tables below, Shrotriya sold 735,993 shares of his Spectrum stock for net proceeds of *almost $7 million*.  In comparison, Shrotriya had *no* proceeds in comparable time periods both before and after the Class Period.

**Pre-Class Period (January 4, 2012 – August 7, 2012):**

| Filer Name | Direct Indirect | Number of Shares | Transaction Type | Price | Transaction Value | Filing Type | Transaction Date |
|---|---|---|---|---|---|---|---|
| Shrotriya (Rajesh C) | D | -68,027 | Conversion | $1.47 | -$99,999.69 | 4 | 12-Jul-12 |
| Shrotriya (Rajesh C) | D | 4,827 | Gift | $0.00 | $0.00 | 5 | 13-Jul-12 |
| Shrotriya (Rajesh C) | D | 1,609 | Gift | $0.00 | $0.00 | 5 | 13-Jul-12 |
| **TOTAL** | | | | | **-$99,999.69** | | |

**Class Period (August 8, 2012 through March 12, 2013, inclusive):**

| Filer Name | Direct Indirect | Number of Shares | Transaction Type | Price | Transaction Value | Transaction Date |
|---|---|---|---|---|---|---|
| Shrotriya (Rajesh C) | D | -75,000 | Conversion | $1.06 | -$79,500.00 | 9-Aug-12 |
| Shrotriya (Rajesh C) | D | 41,500 | Sale[1] | $12.53 | $519,995.00 | 14-Aug-12 |
| Shrotriya (Rajesh C) | D | 83,000 | Sale[1] | $12.54 | $1,040,820.00 | 15-Aug-12 |
| Shrotriya (Rajesh C) | D | 84,000 | Sale[1] | $12.61 | $1,059,240.00 | 16-Aug-12 |
| Shrotriya (Rajesh C) | D | 33,000 | Sale[1] | $12.53 | $413,490.00 | 5-Sep-12 |
| Shrotriya (Rajesh C) | D | 34,000 | Sale[1] | $12.63 | $429,420.00 | 6-Sep-12 |
| Shrotriya (Rajesh C) | D | 33,000 | Sale[2] | $13.02 | $429,660.00 | 18-Sep-12 |
| Shrotriya (Rajesh C) | D | 33,000 | Sale[2] | $12.74 | $420,420.00 | 19-Sep-12 |
| Shrotriya (Rajesh C) | D | 4,800 | Sale[2] | $12.50 | $60,000.00 | 20-Sep-12 |
| Shrotriya (Rajesh C) | D | 11,350 | Sale[2] | $12.50 | $141,875.00 | 9-Oct-12 |
| Shrotriya (Rajesh C) | I | -10,676 | Gift | $0.00 | $0.00 | 18-Dec-12 |
| Shrotriya (Rajesh C) | I | -445,993 | Gift | $0.00 | $0.00 | 18-Dec-12 |
| Shrotriya (Rajesh C) | I | 445,993 | Gift | $0.00 | $0.00 | 18-Dec-12 |
| Shrotriya (Rajesh C) | I | -455,516 | Gift | $0.00 | $0.00 | 18-Dec-12 |
| Shrotriya (Rajesh C) | D | 10,676 | Gift | $0.00 | $0.00 | 18-Dec-12 |
| Shrotriya (Rajesh C) | D | 455,516 | Gift | $0.00 | $0.00 | 18-Dec-12 |
| Shrotriya (Rajesh C) | D | -163,139 | Acquisition | $11.34 | -$1,849,996.26 | 19-Dec-12 |
| Shrotriya (Rajesh C) | I | 2,823 | Gift | $0.00 | $0.00 | 20-Dec-12 |
| Shrotriya (Rajesh C) | D | 10,000 | Gift | $0.00 | $0.00 | 20-Dec-12 |
| Shrotriya (Rajesh C) | I | -10,000 | Gift | $0.00 | $0.00 | 20-Dec-12 |
| Shrotriya (Rajesh C) | D | 172,507 | Sale* | $11.35 | $1,957,954.45 | 28-Dec-12 |
| Shrotriya (Rajesh C) | D | 205,836 | Sale* | $11.24 | $2,313,596.64 | 31-Dec-12 |
| **TOTAL** | | | | | **$6,856,974.83** | |

**Post Class Period (March 13, 2013 through May 19, 2014):**

| Filer Name | Direct Indirect | Number of Shares | Transaction Type | Price | Transaction Value | Transaction Date |
|---|---|---|---|---|---|---|
| Shrotriya (Rajesh C) | D | 3,482 | Gift | $0.00 | $0.00 | 11-Jun-13 |
| Shrotriya (Rajesh C) | D | -206,448 | Conversion | $1.99 | -$410,831.52 | 4-Sep-13 |
| Shrotriya (Rajesh C) | D | -197,500 | Conversion | $4.90 | -$967,750.00 | 4-Sep-13 |
| Shrotriya (Rajesh C) | D | -80,000 | Acquisition | $0.00 | $0.00 | 13-Dec-13 |
| Shrotriya (Rajesh C) | D | 28,344 | Gift | $0.00 | $0.00 | 30-Dec-13 |
| Shrotriya (Rajesh C) | I | 2,329 | Gift | $0.00 | $0.00 | 30-Dec-13 |
| Shrotriya (Rajesh C) | I | -28,344 | Gift | $0.00 | $0.00 | 30-Dec-13 |
| **TOTAL** | | | | | -$1,378,581.52 | |

165.    At the same time Shrotriya was unloading almost a million of his own shares at artificially inflated prices, he repeatedly emphasized the millions spent by Spectrum to buy back stock because of the purported "belief" Defendants had in the Company and its business – thus fueling his own illicit gains.  The stock buyback had the further intended effect of propping up the Company's stock price, from which Shrotriya profited on his Class Period stock sales.

166.    At the September 10, 2012 Rodman & Renshaw Global Investment Conference, Shrotriya stated:

> We picked up over 1 million shares *because we believe there's nothing better than to invest in yourself*.  And if you believe your stock is undervalued, buy it. And that's what we did. We spent about $11.9 million of our cash that we made profit in buying our own shares.

167.    At the September 20, 2012 UBS Global Life Sciences Conference, Shrotriya stated:

> And because of the cash we are generating, our Board authorized a buyback program. And as of last month, we had bought – nearly 1 million shares we bought back for about $11.9 million, and retired them. That is our way of saying, adding shareholder value.

168.     On the November 7, 2012 earnings call Brett Scott, Chief Accounting Officer and

acting Chief Financial Officer stated:

> And just a quick update on our stock buyback program. *We
> purchased 705,000 shares for a total of $8.6 million* in the third
> quarter ending September.

169.     On the February 21, 2013 earnings call Shrotriya stated "[a]dditionally, we

returned more than $18 million back to the shareholders through the issuance of cash dividends

and our stock buyback program."

170.     Shrotriya was notoriously controlling over every aspect of Spectrum's business,

publicly stating at least twice during the Class Period that he interviews every single employee

hired, down to the janitorial staff.  At the September 10, 2012 Rodman & Renshaw Global

Investment Conference, Shrotriya stated:

> Our focus has therefore been to bring our expertise and passion for
> excellence to acquire, develop and commercialize. That's all we
> have done – use our passion to acquire, develop and
> commercialize. We develop ourselves; we don't use CROs – sorry
> for CROs – and we commercialize ourselves.  Every person in the
> Company is a stockholder in the Company; their skin is in the
> game. And that's what drives the passion. *Every person I hire in
> the salespeople, I look into their eyes.  I hire every single person in
> the Company, whether they are a janitor or a receptionist or a
> salesperson*, because I'm looking for the passion in their eyes.

171.     During the September 27, 2012 PropThink interview, Shrotriya stated:

> And also, every single employee in the company is passionate at
> making a difference.  *I interview every single employee who joins
> the company, whether they're the janitor, or an administrative
> assistant or a salesperson.*  And I look into their eyes and look for
> passion and excitement and commitment.

172.     CW3 described Spectrum as the "Raj Shrotriya show."  According to CW3,

Shrotriya was so controlling that he even insisted on choosing the menu for the Company

Christmas party himself.  CW3 described Shrotriya as a "control freak" with a Napoleon

complex and "an ego you can see from space." CW3 frequently butted heads with Shrotriya because Shrotriya always insisted on "putting a positive spin on everything" and "wouldn't let facts get in the way of telling a good story." CW3 observed that there was a lot of turnover at the "c-level" or executive level at Spectrum, citing the revolving door of Chief Medical Officers at the Company as an example. CW3 explained that because it was the "Raj Shrotriya show," if you disagree with the king you get "beheaded."

173.    CW11 recalled Shrotriya as being "extremely controlling." CW11 stated that anyone hired at Spectrum had to go through "his [Shrotriya's] test."

174.    CW7 stated that no one could ever question CEO Raj Shrotriya. CW7 explained that if anyone butted heads with Shrotriya, they had already decided that they were leaving the Company because Shrotriya would never allow anyone to question him.

175.    CW13 was a Regional Business Manager for Spectrum's Southeast region for two and a half years until January 2013. CW13 supervised eight oncology sales representatives in the Southeast region (in Florida, Tennessee, Georgia, the Carolinas, Mississippi, and Alabama) in addition to managing his own Zevalin accounts. CW13 knew of the issues the Company had with Fusilev from his exposure to the management team that oversaw sales of both Zevalin and Fusilev. CW13 witnessed Shrotriya treating Spectrum as his personal "piggy bank," stating that Shrotriya was like the "Sultan of Brunei" and that everything at Spectrum was "all about him." According to CW13, Shrotriya and Scott were well aware of the "shenanigans that took place." CW13 confirmed that Scott had access to detailed information about Spectrum's business.

176.    The majority of Shrotriya's compensation during the Class Period was "at-risk," *i.e.*, not guaranteed. The April 30, 2013 proxy statement states:

> [T]he guaranteed pay (base salary and "all other compensation") of
> the Chief Executive Officer was only 11% of his potential 2012

compensation and *approximately 89% was at risk pay* (annual cash bonuses and equity incentive awards) that was *dependent on Company or individual performance (including performance of the Company's stock price).*

177.   The April 29, 2014 proxy statement states:

[T]he guaranteed pay (base salary, benefits and perquisites) of our Chief Executive Officer was only 19% of his potential compensation for 2013 and *approximately 81% was at risk pay* (annual cash bonuses, stock awards and option awards) that was *dependent on the achievement of Company* or individual performance targets, *or appreciation in the value of our shares.*

178.   The Defendants' compensation for 2012 and 2013 is set forth below:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Rajesh C. Shrotriya, M.D. | 2013 | 900,000 | 900,000 | 734,400 | 2,929,657 | 167,508 | 5,631,565 |
| Chairman, Chief Executive Officer and President | 2012 | 800,000 | 1,600,000 | 1,849,996 | 5,535,358 | 322,955 | 10,108,309 |
| Joseph K. Keller[6] | 2013 | 550,000 | 275,000 | 288,600 | 472,794 | 110,986 | 1,697,380 |
| Executive Vice President and Chief Operating Officer | 2012 | 175,000 | 213,000 | 1,441,200 | 2,120,378 | 6,057 | 3,955,635 |
| Joseph W. Turgeon[6] | 2013 | 450,000 | 260,000 | 240,500 | 351,157 | 63,412 | 1,365,069 |
| Senior Vice President and Chief Commercial Officer | 2012 | 72,338 | 100,000 | 552,500 | 892,500 | 6,057 | 1,623,395 |
| Brett L. Scott[9] | 2013 | 256,250 | — | — | — | 60,591 | 316,841 |
| Senior Vice President, Finance | 2012 | 250,000 | 50,000 | — | 176,698 | 70,116 | 546,814 |

179.   In 2012, Shrotriya's cash bonus was twice the value of his base salary because the Board, according to Spectrum's proxy statement, determined that Shrotriya had met or exceeded all the goals set for the Company and for his performance. In particular, he met the no. 1 "Key Financial Goal" to increase the Company's total revenue by "at least 15%." Fusilev revenues made up over 75% of total revenues in 2012. As described above, the Fusilev revenues for 2012 were artificially inflated by Defendants, who fraudulently concealed the actual decline in end-user demand by selling deeply discounted bulk shipments to distributors. Similarly, the Board awarded Shrotriya almost a million options and over 150,000 shares because it determined that

"the Company and the Chief Executive Officer accomplished all of the major financial and strategic goals established by the Committee at the beginning of 2012."

## IX. CLASS ACTION ALLEGATIONS

180. ATRS brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all purchasers of Spectrum's securities between August 8, 2012 and March 12, 2013 inclusive and who were damaged when the truth about Spectrum's Fusilev business was disclosed. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

181. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Spectrum had more than 59 million shares of common stock outstanding that traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Spectrum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

182. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

183. ATRS will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

82

184.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) to state material facts about Spectrum's business, in particular the sales of Fusilev, its core product during the Class Period, as well as the Company's operations and management;

(c)   whether the Defendants made their misstatements or misrepresentations with the required scienter; and

(d)   to what extent the members of the Class have sustained damages and the proper measure of damages.

185.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE AFFILIATED UTE DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE

186.   Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Defendants are primarily predicated upon omissions of material fact which there was a duty to disclose.

187.   Plaintiff is entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding Fusilev's sales prospects and the impact of generic leucovorin on Fusilev.

188.   Alternatively, Plaintiff is entitled to a presumption of reliance under the fraud on the market doctrine of the Defendants' material misrepresentations and omissions, because at all relevant times, the market for Spectrum's securities was an efficient market for the following reasons, among others:

(a)   Spectrum's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Spectrum filed periodic public reports with the SEC (and was eligible to file SEC Form S-1) and the NASDAQ;

(c)   Spectrum regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Spectrum was followed by numerous investor research services that published publicly available reports, as well as by several securities analysts (including Michael G. King, Jr. at Rodman & Renshaw and Dawson James Securities; Joseph Pantginis and Raluca Pancratov at Roth Capital Partners; Adnan Butt, Michael J. Yee, and Charmaine Chan at RBC Capital Markets; and Jason Kantor, Jeremiah Shepard, Ravi Mehrotra, Lee Kalowski and Koon Ching at Credit Suisse) at major brokerage firms who wrote reports that were distributed to the

sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

189.   As a result of the foregoing, the market for Spectrum's securities promptly digested current information regarding Spectrum from all publicly available sources and reflected such information in Spectrum's stock price. Under these circumstances, all purchasers of Spectrum's securities during the Class Period suffered similar injury through their purchase of Spectrum's securities at artificially inflated prices and a presumption of reliance applies.

## XI.   NO SAFE HARBOR

190.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, most of the identified false and misleading statements and omissions herein are not forward looking statements, but are statements of current and historic fact regarding Spectrum's practices.

191.   To the extent that any of the false and misleading statements identified herein are mixed statements of current fact and forward looking projection, the portion of those statements relating to current fact are not protected by the safe harbor.

192.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking

85

statement was authorized and/or approved by an executive officer of Spectrum who knew that those statements were false when made.

## XII.   LOSS CAUSATION/ECONOMIC LOSS

193.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and the Class.

194.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Spectrum's securities by misrepresenting, or failing to disclose that (1) multiple sources of pharmaceutical sales data available to Defendants during the Class Period demonstrated that the rising supply of generic leucovorin would have an imminent and much larger impact on Fusilev revenues than Defendants led the market to believe; and (2) Defendants "stuffed" the inventories at Spectrum's main distributor customers to disguise declining Fusilev sales.

195.   The truth about Spectrum's core Fusilev business was disclosed in a press release issued after the market closed on March 12, 2013, in which Defendants acknowledged that Fusilev sales would be drastically reduced, and that overall revenues were consequently expected to be *over a hundred million dollars less* than analysts' expectations.  In response, Spectrum's stock price plummeted *over 37%* on unusually heavy trading volume, with 22,555,500 shares traded compared with an average daily trading volume over the Class Period of 1,148,078 shares.

## COUNT I

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5(b)
### Promulgated Thereunder Against All Defendants[24]

196.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

197.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Spectrum's business, operations, management and the intrinsic value of Spectrum's securities; and (ii) cause Plaintiff and other members of the Class to purchase securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

198.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Spectrum's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

199.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the true business prospects of Fusilev, Spectrum's core product during the Class Period, as specified herein.

---

[24] Defendant Keller is only charged with certain misstatements and omissions made after he became COO in September 2012.

200.    The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Spectrum's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Spectrum and its Fusilev business in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Spectrum's securities during the Class Period.

201.    Each of the Individual Defendants' primary liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading, or failed to disclose material information that made those statements false and misleading.

202. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true condition of Spectrum's Fusilev business from the investing public and supporting the artificially inflated price of the Company's securities. As demonstrated by Defendants' misstatements of the Company's core Fusilev business throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

203. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Spectrum's securities was artificially inflated during the Class Period. In ignorance of the fact that market price of Spectrum's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Spectrum's securities during the Class Period at artificially high prices and were damaged when the value of their securities declined upon disclosure of the truth about Defendants' false and misleading statements and omissions.

204.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Spectrum's Fusilev business, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Spectrum's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

205.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

206.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5(a) and (c)
### Promulgated Thereunder Against All Defendants[25]

207.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

208.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiff need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

---

[25] Defendant Keller is charged with this Count for conduct that occurred after he became COO in September 2012.

209.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiff and the Class; (ii) artificially inflate the market price of Spectrum's securities; and (iii) cause Plaintiff to purchase Spectrum's securities at artificially inflated prices.

210.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the Class in connection with their purchases of Spectrum's securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

211.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of information regarding Spectrum's core Fusilev business.

212.    Plaintiff and the Class reasonably relied upon the integrity of the market in which Spectrum's securities traded.

213.    During the Class Period, Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct.  Had Plaintiff and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Spectrum's securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

214.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiff and the Class suffered damages in connection with their purchases of Spectrum's securities during the Class Period.

215.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiff and the Class for damages suffered in connection with their purchases of Spectrum's securities during the Class Period.

## COUNT III

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants[26]

216.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

217.    The Individual Defendants acted as controlling persons of Spectrum within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's core operations and/or intimate knowledge of the false statements filed by the Company with the SEC and otherwise disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements regarding Spectrum's core Fusilev business prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

218.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have

---

[26] Defendant Keller is charged with control person violations for Spectrum statements made after he became COO in September 2012.

had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

219.  As set forth above, Spectrum violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as control persons of Spectrum, the primary violator.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action and certifying ATRS as class representative under Rule 23 of the Federal Rules of Civil Procedure and Labaton Sucharow LLP as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 20, 2014

**THE O'MARA LAW FIRM, P.C.**

By:   */s/ David C. O'Mara*
William M. O'Mara (Nevada Bar No. 0837)
David C. O'Mara (Nevada Bar No. 8599)
**THE O'MARA LAW FIRM, P.C.**
311 E. Liberty St.
Reno, Nevada  89501
Telephone: (775) 323-1321
Facsimile: (775) 323-4082
Email: bill@omaralaw.net
        david@omaralaw.net

*Local Counsel for the Class*

Jonathan Gardner
Mark S. Goldman
Angelina Nguyen
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
        mgoldman@labaton.com
        anguyen@labaton.com

*Attorneys for Lead Plaintiff Arkansas Teacher
Retirement System and Lead Counsel for the
Class*

# APPENDIX 1

## *List of CWs*

| CW | Title/Position at Spectrum | Dates of Employment |
|----|----------------------------|---------------------|
| 1 | Oncology Sales Specialist (through Inventiv) Responsible for certain medical facilities, mostly clinics and a few hospitals, in Massachusetts, Rhode Island, New Hampshire and Maine. | August 2011 through May 2013 |
| 2 | Oncology Sales Specialist (through Inventiv), sold Fusilev exclusively Responsible for the Chicago area, selling to private practice clinics and oncology clinics within hospitals | End of 2011 through April 2013 |
| 3 | Senior Manager, Investor Relations Responsible for scripting investor presentations and writing all press releases | 2007-March 2012 |
| 4 | Regional Sales Manager Spent a few months working in the field and then transitioned to being in charge of training sales personnel on selling Fusilev | August 2011 through July 2012 |
| 5 | Director of Government Affairs and Managed Markets Responsible for managing issues related to reimbursement as well as issues related to private insurance companies, Medicare and Medicaid | December 2010 through December 2013 |
| 6 | Sales Specialist in Northern California Sold Fusilev to hospitals and doctors' offices | November 2011 through May 2013 |
| 7 | Director of National Sales Implemented the Company's marketing strategy and was responsible for supervising the Inventiv sales team | August 2011 through December 2013 |
| 8 | Associate Director of National Accounts (transitioning to) Regional Business Manager  As Associate Director of National Accounts, was responsible for the McKesson and US Oncology Fusilev accounts until late 2011. For the remainder of his tenure, worked on direct contract sales to the larger clinics | January 2009 through November 2011  September/October 2011 through November 2013 |

1

| CW | Title/Position at Spectrum | Dates of Employment |
|----|----------------------------|---------------------|
| 9 | Associate Director of National Accounts Worked with the wholesalers and GPOs that were supplying Fusilev to the hospitals and the private oncology practices (clinics) | 2010 through March 2012 |
| 10 | Senior Level Network Administrator, IT department Responsible for technical support for the executives, including Shrotriya | July 2009 through September 2012 |
| 11 | District Manager Reported to Director of National Sales | March 2009 to July 2012 |
| 12 | Oncology Sales Specialist (through Inventiv) Sold Fusilev to clinics and hospitals in Tennessee | August 2011 through May 2013 |
| 13 | Regional Business Manager for Southeast region Supervised eight oncology sales representatives and managed Zevalin accounts | two and a half years until January 2013 |